881 A.2d 719

ANTONIO GONZALEZ, PLAINTIFF–RESPONDENT, v. SAFE AND SOUND SECURITY CORP. DEFENDANT AND THIRD PARTY-PLAINTIFF, AND ATLANTIC CITY HOUSING & URBAN RE-NEWAL ASSOCIATES, L.P. D/B/A THE SCHOOLHOUSE APARTMENTS, DEFENDANT–APPELLANT, AND RAYMOND BUNN, SECURITY OFFICER, COMMUNITY REALTY MAN-AGEMENT CORPORATION AND INSIGNIA MANAGEMENT GROUP, DEFENDANTS, AND AHMID ABDULLAH, THIRD PARTY–DEFENDANT.

Argued January 3, 2005—Decided September 19, 2005.

102

104

*Thomas E. Hastings* argued the cause for appellant (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Mr. Hastings and William J. Brennan, III,* of counsel).

*R.C. Westmoreland* argued the cause for respondent (*Westmoreland, Vesper, Schwartz & Quattrone,* attorneys; *Mr. Westmoreland and Kathleen F. Beers,* on the brief).

Justice ALBIN delivered the opinion of the Court.

Plaintiff Antonio Gonzalez initiated a civil action against several defendants to recover damages for personal injuries that he suffered when he was shot in an apartment complex in Atlantic City. At trial, plaintiff was called to the stand by defendants but refused to testify. When ordered by the court to testify, he still refused to do so. After plaintiff openly defied the court's order, defendants moved to dismiss the complaint, asserting that plaintiff had denied them testimony relevant to their defense. The court denied the dismissal motion and instead instructed the jury that it could draw an adverse inference from plaintiff's failure to testify.

Plaintiff won a favorable verdict and substantial damage award. On appeal, the sole remaining defendant, the apartment complex

owner, claimed that the court erred in not dismissing the complaint after plaintiff willfully refused to give testimony. Defendant also contended that the court erred in charging the jury and in awarding counsel fees to plaintiff. The Appellate Division affirmed the verdict and damages award. *Gonzalez v. Safe & Sound Sec. Corp.*, 368 *N.J.Super.* 203, 214, 845 *A.*2d 700 (App.Div. 2004). We now reverse and hold that the trial court abused its discretion by not advising plaintiff that unless he testified, he faced the certain dismissal of his complaint.

## I.

### A.

On April 25, 1996, Ahmid Abdullah shot plaintiff Antonio Gonzalez in the common area of the Schoolhouse Apartments in Atlantic City. As a result of the shooting, plaintiff suffered a spinal cord injury that left him paralyzed from the mid-chest down. In 1997, plaintiff filed a lawsuit alleging that his injuries were caused by the negligence of various defendants who failed to provide adequate security to the apartment complex despite their knowledge that the complex was plagued by criminal activities. Plaintiff named as defendants (1) Atlantic City Housing & Urban Renewal Associates, L.P. (ACHURA), the owner of the Schoolhouse Apartments; (2) Safe and Sound Security Corporation (Safe and Sound), the company retained to provide security for the apartment complex; (3) Raymond Bunn, the Safe and Sound security guard on duty the night plaintiff was shot; (4) Community Realty Management Corporation (Community Realty), the company that provided management services to the apartment complex; and (5) Insignia Management Group (Insignia Management), a management company that succeeded Community Realty several weeks before the shooting. Safe and Sound filed a third-party complaint against Abdullah. Before trial, Community Realty and Insignia Management both settled with plaintiff for $100,000 each. Abdullah defaulted and judgment was entered against him.

At a jury trial in 2001, plaintiff and the remaining defendants presented evidence describing the shooting, its aftermath, and the security conditions at the apartment complex during the months leading up to and on the day of the shooting. On the evening of the shooting, plaintiff and his friend, Antoine Robinson, entered the Schoolhouse Apartments through an electronic gate after identifying themselves to a security guard in a booth. Once inside one of the buildings, Robinson became embroiled in a heated verbal exchange with Abdullah, who apparently had stepped on his sneaker. The war of words lasted three to five minutes and escalated into a fistfight. Plaintiff unsuccessfully attempted to restrain his friend from fighting. After several minutes of slugging each other, Robinson and Abdullah paused and agreed to take the fight outside. They resumed exchanging blows in a breezeway between two buildings, where twenty to twenty-five people gathered to watch. Before the increasingly noisy crowd, the fight continued for five to seven minutes until plaintiff and another man stepped in and separated the combatants.

Plaintiff grabbed Robinson and told him, "come on, let's leave," while the other man held on to Abdullah. As plaintiff pulled him away, Robinson threatened Abdullah, "I'll be back; I'm going to burn you." With Robinson out of earshot, Abdullah asked someone in the crowd for a gun, and within moments, Abdullah was armed with a .38 caliber revolver. He pursued Robinson who, along with plaintiff, had rounded the building's corner and was trying to get the guard to open the locked exit gate. Abdullah fired six rounds in Robinson's direction, striking plaintiff twice. At no time did the Schoolhouse Apartment security guard intervene to stop the fight or call the police for assistance.

Plaintiff and Robinson gave conflicting explanations for their presence at the Schoolhouse Apartments that night. After identifying himself as Antonio Gomez, plaintiff told a police officer that he and Robinson were "looking for a female by the name of Shakima in room 207." In contrast, Robinson told the officer that they were there to visit a woman named "Kimmy" in "apartment

322." In yet another version, plaintiff stated at his deposition that he and Robinson "were about to go to [Robinson's] house." In his deposition testimony, plaintiff estimated that the entire incident lasted twenty minutes and that he and Robinson were at the gate trying to get out "for about five minutes."

## B.

Plaintiff presented evidence that, in the years before the shooting, ACHURA did not commit sufficient resources to combat the crime that had become commonplace on its premises. Detective Sergeant Charles Love, an Atlantic City police officer, testified that from 1994 to 1996, police officers responded to "numerous calls" concerning fights at the Schoolhouse Apartments. He described a "consistent level of problems" at the apartments that included drugs, violence, and guns. In his opinion, the in-house security was not staffed properly to cope with the criminal activities at the apartment complex.

Christopher Harty testified as an expert regarding the way the security guard should have conducted himself that day. Harty concluded that the fight could have been prevented had the security guard followed "established" protocol, used "common sense," and called the police immediately. Instead, according to Harty, the guard became just another spectator in the crowd, exhibiting no "command presence."

Leslie Cole, another security expert, testified that Safe and Sound deployed the guard on duty at the Schoolhouse Apartments without providing him with even "minimal training" or supervision. In Cole's opinion, had the guard "made his presence known" to the crowd and announced "that he was calling the police," the shooting could have been averted. Moreover, he found that a single guard on duty without "proper equipment" was insufficient to deal with the security needs of the apartment complex.

Representatives of ACHURA, Community Realty, Insignia Management, and Safe and Sound all acknowledged that security was inadequate to deal with the criminal activity at the beleag-

uered Schoolhouse Apartments. The apartment complex was the scene of drug offenses, assaults, burglaries, and shootings. ACHURA, the property managers, and the security agency agreed that there was a clear need for increased security, but differed on who was responsible for providing it, pointing fingers at one another and directing blame away from themselves.

Lawrence Sherman, Safe and Sound's expert in "the scientific study of the causes, prediction and prevention of crime," testified that nothing in the evidence suggested that additional security measures, such as a risk analysis study, additional guards, or even calling the police, would have prevented the shooting. Based on his review of empirical data, he asserted that such measures have not been shown to "reduce gun violence among angry young men." ACHURA's security expert, Ira Somerson, conceded that the "overall security program" at the Schoolhouse Apartments was a "nightmare" and that there should have been two armed security officers on duty "around the clock." He concluded, however, that the events that led to the shooting happened in a span of no more than five minutes and, consequently, there was little that any security officer could have done to prevent the tragedy. Although he found the shooting to be "foreseeable," he emphasized that security cannot guarantee protection from random violence.

## C.

On the issue of damages, Dr. Virginia Graziani, a specialist in rehabilitation medicine, testified that one of the two bullets that struck plaintiff caused a spinal cord injury that left plaintiff paralyzed from the mid-chest down. Dr. Graziani estimated that there was no more than a five percent chance that plaintiff would ever regain significant use of his legs. Plaintiff's wife, mother, and sister testified to the life-altering nature of his injuries, the activities he can no longer perform or participate in, the daily pain he suffers, and his general unhappiness.

### D.

During trial, plaintiff did not testify in his own behalf. Defendants then served a notice in lieu of subpoena for plaintiff to be produced as a witness. Plaintiff's motion to quash the notice on the ground that it should have been served before trial was denied. A week later, plaintiff's counsel advised the court that his client "really doesn't want to testify." The court observed that plaintiff had been present during the entire trial. The court ruled that defendants had a "right" to plaintiff's testimony because as an "eyewitness to everything that happened," he possessed relevant, non-redundant information. For example, the court noted, plaintiff could testify to his observations of the security guard, to the noise level of the crowd, to the duration of the entire incident, and to his injuries.

Plaintiff's counsel explained that his client had "nothing to add" and did not want to answer defense counsel's "questions because if he does he puts himself and his credibility on the line." Plaintiff's counsel expressed concern that defendants might ask plaintiff whether he had a gun on the night of the incident or question him about his guilty plea to a "strong arm robbery" at the Schoolhouse Apartments one month before the shooting. Counsel suggested that if his client decided not to comply with the notice, the appropriate remedy would be to let the jury draw an adverse inference from his failure to testify.

The court entered an order compelling plaintiff to testify if called as a witness. Eight days later, when defendant Safe and Sound called plaintiff to the stand, he refused to testify. Plaintiff persisted in his refusal even after being reminded of the court's order. Plaintiff's counsel informed the court that he had advised plaintiff not to testify.

Defendants then moved to dismiss plaintiff's case. The court, however, declined to do so, deciding that the appropriate sanction

would be a *"Clawans"* adverse inference jury instruction.[1] In reaching its decision, the court acknowledged that plaintiff's "testimony would not be merely cumulative" and that "it would be at least equal to if not superior to testimony already given in [the] case." The court further acknowledged plaintiff could shed light on

> how the fight started, his role in the fight, whether or not there were people yelling I'm gonna call the police, whether or not there were twenty or twenty-five people, how, how what was the nature of the din, the noise level during the course of the fight, whether the guard was there or not there, whether the guard if he was there said anything or didn't say anything, at what point the guard appeared, and the time lines.

Nevertheless, the court reasoned that the jury had heard "substantial testimony from many witnesses, both lay and expert, regarding the events" and plaintiff's "disabilities," and that the jury had "sufficient evidence" to determine the case. In rejecting alternative sanctions, the court noted that dismissing the case would be a "Draconian measure" and incarcerating plaintiff "an exercise in futility." The court granted defendants' motion to read plaintiff's entire deposition to the jury, with the exception of that portion of his testimony addressing his guilty plea to the strong arm robbery.

In its instructions on the law, the court charged the jury that it could draw an adverse inference from plaintiff's failure to testify.[2] The court also charged the jury on ACHURA's duty, as a property owner, to exercise reasonable care to protect persons lawfully on its premises from foreseeable dangers, such as the criminal acts of third parties.

## E.

The jury rendered a verdict finding that the negligence of ACHURA and Community Realty was the proximate cause of

---

[1] *State v. Clawans*, 38 *N.J.* 162, 170–72, 183 A.2d 77 (1962).

[2] We note that the entirety of the instruction essentially adhered to *Model Jury Charge (Civil)*, Witness—Failure of a Party to Produce § 1.18(B) (1970).

.

plaintiff's injuries and that Community Realty was acting as ACHURA's agent. The jury also found that Safe and Sound and Insignia Management were not liable and that plaintiff was not comparatively negligent.[3] The jury assigned the following percentages of liability to those responsible for plaintiff's injuries: 40% to ACHURA; 30% to Community Realty; and 30% to Abdullah, against whom the court had entered judgment due to his default. The court granted plaintiff's motion to allocate Community Realty's percentage liability to ACHURA.

The jury awarded plaintiff $2,364,331.45 in total damages: $1,140,000 for future care expenses; $1,000,000 for pain, suffering, and loss of enjoyment of life; $142,272 for loss of past and future earnings; and $82,059.45 for past medical expenses. In addition, the court awarded plaintiff $782,496.55 in prejudgment interest.

Before trial, pursuant to *Rule* 4:58–1, –2, plaintiff made an offer of judgment to ACHURA in the amount of $800,000. ACHURA declined the offer. Because the verdict exceeded 120% of the offer rejected by ACHURA, the court awarded $260,343.25 in counsel fees, $64,851.18 in litigation costs, and $28,458.88 in enhanced interest in accordance with *Rule* 4:58–2. Plaintiff's total recovery was $3,500,481.31.

ACHURA appealed.

## F.

The Appellate Division affirmed. *Gonzalez, supra,* 368 *N.J.Super.* at 214, 845 *A.*2d 700. First, the appellate panel rejected ACHURA's argument that plaintiff's refusal to testify should have resulted in a dismissal of plaintiff's claim rather than an adverse inference charge. *Id.* at 208, 845 *A.*2d 700. The panel stressed that plaintiff, "essentially an innocent bystander," could not have

---

[3] The trial court instructed the jury that because defendant security guard Raymond Bunn was "an employee of Safe and Sound Corporation, his negligence would be imputed to Safe and Sound." The jury verdict therefore did not include a separate determination of Bunn's culpability.

offered testimony that would have "materially and legitimately assisted" ACHURA's case. *Id.* at 208–09, 845 *A.*2d 700. Further, the panel found that ACHURA could not have benefited from an attack on plaintiff's credibility, which was "tertiary to the pivotal issues." *Id.* at 210, 845 *A.*2d 700. Noting that "dismissal is not favored if lesser sanctions will suffice," the panel was satisfied "that the trial court did not abuse its discretion in choosing" the remedy of the adverse inference charge. *Id.* at 208–09, 845 *A.*2d 700. The panel concluded that the "trial court's approach was a reasonable choice" among the available options. *Id.* at 210, 845 *A.*2d 700.

Second, the panel disagreed with ACHURA's contention that the trial court should have charged the jury not only on a property owner's duty to a business invitee, but also on the lesser duties of care applying to a social guest or trespasser. *Id.* at 210–11, 845 *A.*2d 700. The panel observed that plaintiff was injured in a "public area of a commercial apartment complex" and that there was no evidence that plaintiff was trespassing. *Id.* at 211–12, 845 *A.*2d 700. Because owners of multi-unit dwellings, like ACHURA, owe the same duty of care to anyone legally in the common areas, the panel concluded that plaintiff's status on the property was irrelevant. *Ibid.*

Third, the Appellate Division rejected ACHURA's argument that plaintiff was not entitled to counsel fees and litigation costs under the Offer of Judgment Rule, *Rule* 4:58–1, –2. *Id.* at 213, 845 *A.*2d 700. Under that Rule, a plaintiff is entitled to counsel fees only if the verdict is at least 120% greater than the rejected offer. *Ibid.* The panel recognized that ACHURA had filed for bankruptcy and that the bankruptcy court had limited any recovery against ACHURA to its " 'insurance coverage in effect' " at the time of the shooting—a maximum of $1,000,000 per bodily injury occurrence. *Ibid.* ACHURA argued that after plaintiff settled with ACHURA's agent, Community Management, for $100,000, plaintiff's potential recovery was limited to $900,000, and therefore plaintiff's $800,000 settlement offer should have been

measured against the available insurance coverage, not ACHU-RA's 70% liability for the $2,364,331 jury award. *Id.* at 212–13, 845 *A.*2d 700. The panel concluded that while plaintiff's actual recovery was restricted to the insurance policy limits, the plain language of *Rule* 4:58–2 required the offer to be compared to the verdict. *Id.* at 213–14, 845 *A.*2d 700.

We granted ACHURA's petition for certification. *Gonzalez v. Safe & Sound Sec. Corp.*, 180 *N.J.* 455, 852 *A.*2d 191 (2004).[4]

## II.

We first address ACHURA's contention that it had a fundamental right to present a defense by calling plaintiff as a witness and that plaintiff's deliberate refusal to testify merited dismissal of the case.

■ Defendants have a right to a plaintiff's testimony in presenting their defense. *N.Y., Susquehanna & W. R.R. Co. v. Vermeulen*, 44 *N.J.* 491, 501, 210 *A.*2d 214 (1965) ("Due process requires that there be an opportunity to present every available defense . . . ." (internal quotations omitted)); *Paco v. Am. Leather Mfg. Co.*, 213 *N.J.Super.* 90, 93, 516 *A.*2d 623 (App.Div.1986) ("[A] party's fundamental right to due process which includes the right to present and cross examine a witness, must be respected."). *Rule* 1:9–1 provides that "[t]he testimony of a party who could be subpoenaed may be compelled by a notice in lieu of subpoena served upon the party's attorney demanding that the attorney produce the client at trial." Defendants served plaintiff's counsel with notice to produce plaintiff to give testimony. When plaintiff expressed reservations about honoring the notice, the court en-

---

4 The panel also found "no merit in ACHURA's contention that its forty percent liability should not have been combined with its agent's thirty percent liability for purposes of evaluating whether ACHURA's share of liability under the verdict was in excess of 120 percent of plaintiff's settlement offer." *Gonzalez, supra*, 368 *N.J.Super.* at 214, 845 *A.*2d 700. ACHURA did not raise that issue in its petition for certification.

tered an order requiring him to testify. On the advice of counsel, plaintiff baldly defied the court's order. Rather than threaten plaintiff with the dismissal of his case if he did not comply with its order, the court instead chose to charge the jury that it had "a right to infer [that had plaintiff] been produced he would have testified adversely or contrary, against his interest." We must decide whether the trial court abused its discretion in selecting that lesser sanction.

■ The trial court has an array of available remedies to enforce compliance with a court rule or one of its orders. *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 345, 476 *A.*2d 250 (1984). When a plaintiff fails to honor a notice in lieu of subpoena, he subjects himself to the list of sanctions referenced in *Rule* 1:2–4(a), one of which is "dismissal of the complaint." *See R.* 1:9–1. Moreover, *Rule* 4:37–2(a) specifically provides that "the court in its discretion may on defendant's motion dismiss an action or any claim against the defendant" for plaintiff's failure to comply with the "rules" of court "or any order of court." *See also Woodward–Clyde Consultants v. Chem. & Pollution Scis., Inc.,* 105 *N.J.* 464, 470–71, 523 *A.*2d 131 (1987).

■ In assessing the appropriate sanction for the violation of one of its orders, the court must consider a number of factors, including whether the plaintiff acted willfully and whether the defendant suffered harm, and if so, to what degree. *See Abtrax Pharm., Inc. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 514, 655 *A.*2d 1368 (1995). Because the dismissal of a plaintiff's cause of action with prejudice is a drastic remedy, it should be invoked sparingly, such as when the plaintiff's violation of a rule or order evinces " 'a deliberate and contumacious disregard of the court's authority.' " *Kosmowski v. Atl. City Med. Ctr.,* 175 *N.J.* 568, 575, 818 *A.*2d 319 (2003) (quoting *Allegro v. Afton Vill. Corp.,* 9 *N.J.* 156, 160–61, 87 *A.*2d 430 (1952)); *see also Abtrax Pharm., supra,* 139 *N.J.* at 514, 655 *A.*2d 1368 (" 'The dismissal of a party's cause of action, with prejudice, is drastic and is generally not to be invoked except in those cases ... where the refusal to comply is deliberate and

contumacious.' " (quoting *Lang v. Morgan's Home Equip. Corp.*, 6 *N.J.* 333, 339, 78 *A.*2d 705 (1951))). When the vindication of the court's authority standing alone is not at issue, then the prejudice suffered by the defendant also must enter into the calculus in determining the appropriate sanction. *See Crispin, supra,* 96 *N.J.* at 345, 476 *A.*2d 250. The extent to which a plaintiff has impaired a defendant's case may guide the court in determining whether less severe sanctions will suffice. *See Johnson v. Mountainside Hosp.,* 199 *N.J.Super.* 114, 120, 488 *A.*2d 1029 (App.Div.1985) (*per curiam*). Absent serious prejudice, lesser sanctions should be considered. *Crispin, supra,* 96 *N.J.* at 345, 476 *A.*2d 250; *see also Olds v. Donnelly,* 150 *N.J.* 424, 438–49, 696 *A.*2d 633 (1997). But when the plaintiff's disregard of a court order impairs "the defendant's ability to present a defense on the merits," the defendant will be deemed to have suffered irreparable prejudice. *State v. One 1986 Subaru,* 120 *N.J.* 310, 315, 576 *A.*2d 859 (1990); *see also Perna v. Pirozzi,* 92 *N.J.* 446, 457, 457 *A.*2d 431 (1983).

For example, in *Merck & Co. v. Biorganic Laboratories, Inc.,* the Appellate Division affirmed the trial court's entry of a default against defendants who engaged in a "deliberate course of conduct" that "frustrate[d] plaintiff's discovery." 82 *N.J.Super.* 86, 88, 91, 196 *A.*2d 688 (App.Div.1964). In that case, the plaintiff alleged that the defendants had wrongly acquired trade secrets. *Id.* at 88, 196 *A.*2d 688. During discovery, the trial court ordered the defendants to produce important corporate documents for the plaintiff's inspection. *Id.* at 88–89, 196 *A.*2d 688. Despite knowledge of that order, the defendants destroyed the documents sought by the plaintiff. *Ibid.* Judge (later Justice) Sullivan, writing for the Appellate Division, "recognize[d] the trial court's inherent power" to enter a default judgment in light of the defendant's "outrageous conduct," and concluded that "[t]o hold otherwise would permit defendants effectively to frustrate the prosecution of plaintiff's cause of action." *Id.* at 91, 196 *A.*2d 688.

We now apply those principles to the facts before us. Plaintiff had been present during the entire trial, but refused to take the

oath and provide testimony that defendants deemed relevant to their defense. Plaintiff decided for himself that he had "nothing to add" and that he did not want to put "his credibility on the line." On the other hand, the trial court realized that as "an eyewitness to everything that happened," plaintiff was uniquely qualified to provide testimony concerning the whereabouts or absence of the security guard, how much time elapsed from the outbreak of the fight to the shooting, and the size and noisiness of the crowd that gathered to watch the brawl. Those points touched on whether the security guard had both notice and time to respond to the events unfolding at the apartment complex that led to the shooting. The trial court also realized that plaintiff possessed the most detailed and intimate knowledge about the severity of his injuries and how they changed his life. Surely, no witness could have better expounded on the nature and extent of plaintiff's disabilities and the pain and suffering he had endured than plaintiff himself.

A plaintiff cannot invoke the jurisdiction and machinery of our civil justice system, openly defy the court's authority to suit his own purposes, and expect to triumph. A plaintiff does not get to present to the jury his evidence while suppressing another party's evidence, or to pick and choose the rules he intends to follow. The defendant, as much as the plaintiff, has a right to his day in court. Because one of the essential purposes of a civil trial is the search for truth, the one who initiates that process by filing a complaint cannot be permitted to obstruct that search when it becomes unpleasant or inconvenient.

The trial court, not the parties, bears the ultimate responsibility for ensuring the fairness of the proceedings. The court is armed with coercive powers to achieve that end. Here, plaintiff and his attorney made a calculated decision that plaintiff's claim would be better received by the jury if he did not testify, even if he had to bear an adverse inference instruction. As plaintiff postured for partisan advantage, he engaged in brinksmanship with the court, challenging the court's authority to enforce its own order. A court should not surrender control to

manipulative tactics that undermine the basic fairness and integrity of the trial. A plaintiff who refuses to testify in the face of a court order must be told that if he persists in his refusal, his case will be dismissed with prejudice.

Plaintiff argues that the adverse inference charge was the remedy best suited to address his failure to testify at defendants' behest. ACHURA replies that it was entitled to that charge based solely on plaintiff's failure to testify in the presentation of *his* case. However, ACHURA submits that dismissal was warranted because of plaintiff's refusal to testify in the presentation of *its* case. We agree that the adverse inference charge did not cure the prejudice suffered by defendants.

The model civil jury charge for a party's failure to produce a witness provides, in pertinent part, that "where a party (plaintiff/defendant) fails to produce as a witness a person whom that party would naturally be expected to call to testify, [jurors] have a right to infer that had the witness been produced he/she would have testified adversely to the interests of that party." *Model Jury Charge (Civil)*, Witness—Failure of a Party to Produce § 1.18(B) (1970), *available at* http://www.judiciary. state.nj.us/civil/charges/118.htm. The adverse inference charge, also known as the *Clawans* charge, is available when a party does not call to the stand a witness that the party has the power to produce and whose testimony would be superior to testimony presented at trial. *State v. Clawans*, 38 *N.J.* 162, 170–71, 183 *A.*2d 77 (1962). The adverse inference is not to be utilized when the witness is unavailable or likely to be prejudiced against the party calling him. *Id.* at 171, 183 *A.*2d 77. By those standards, defendants would have had a reasonable basis for requesting the charge even had they not served a notice in lieu of subpoena on plaintiff's counsel. Unlike the typical setting for a *Clawans* charge, this case deals with a plaintiff who, despite a court order, refused to testify when called by a defendant.[5]

---

[5] We note that of the four out-of-state cases cited by the Appellate Division, three concerned parties' failure to testify in the presentation of their own cases

In this case, plaintiff's defiance of the court's order was flagrant and without justification, undermined the fairness of the trial process, and prejudiced ACHURA's right to put on a defense. ACHURA was entitled to do more than just read plaintiff's deposition to the jury; it was entitled to place plaintiff before the jury to elicit his version of the events—his timeline, his knowledge of the guard's whereabouts, and his account of how his injuries altered his life.

We understand that the trial court was attempting to balance competing interests by giving relief to ACHURA without treating plaintiff too harshly and scuttling a several-week-old trial. But not every problem lends itself to splitting the difference. Plaintiff's deliberate refusal to testify was an affront to the court's authority and so fundamentally unfair to ACHURA that plaintiff should have been advised that he was facing the immediate dismissal of his cause of action. After such a warning, if plaintiff continued to defy the court's order, then the court should have dismissed plaintiff's case. The court abused its discretion in allowing plaintiff the benefit of his chosen sanction. Plaintiff's attorney candidly acknowledged at oral argument that if this Court were to grant a new trial and his client were given the stark

---

or failure to deny specific facts during their testimony. *See Gonzalez, supra,* 368 *N.J.Super.* at 210, 845 *A.2d* 700 (citing *McGinnis v. Aetna Life & Cas. Co.,* 398 *Mass.* 37, 494 *N.E.2d* 1322, 1323 (1986) (approving trial court's adverse inference when plaintiff failed to deny wrongdoing during her testimony); *Ralph M. v. Nancy M.,* 280 *A.D.2d* 995, 721 *N.Y.S.2d* 192, 193 (2001) (mem.) (approving trial court's adverse inference when plaintiff failed to testify in his own behalf); *Levy v. Equitable Fire & Marine Ins. Co.,* 88 *R.I.* 252, 146 *A.2d* 231, 233 (1958) (same)). Only one case, *Nasrallah v. Davilla,* an Illinois mid-level appellate decision, addressed a party's refusal to testify pursuant to a court rule. 326 *Ill.App.3d* 1036, 260 *Ill.Dec.* 759, 762 *N.E.2d* 25, 31–32 (2001). In that case, it was a *defendant* who refused to testify despite the *plaintiff's* notice to compel his appearance. *Ibid. But cf. First Iowa Hydro Elec. Coop. v. Iowa–Ill. Gas & Elec. Co.,* 245 *F.2d* 613, 615, 629 (8th Cir.) (affirming dismissal of plaintiff co-op's claim when principals repeatedly refused to give deposition testimony or to submit deposit for expenses of special master despite court orders that they do so), *cert. denied,* 355 *U.S.* 871, 78 *S.Ct.* 122, 2 *L.Ed.2d* 76 (1957).

choice of either obeying an order to testify or dismissal of his case, he would testify. We expect other plaintiffs would do likewise. We cannot say that there might not be extraordinary circumstances in which a party could reasonably object to complying with a lawfully served notice in lieu of subpoena. We only need say that those circumstances did not present themselves in this case.

Therefore, we reverse the Appellate Division and the judgment entered in plaintiff's favor, and remand for a new trial.

### III.

We next review ACHURA's claim that the trial court erred by removing from the jury's consideration plaintiff's legal status on its property. The jury was charged only on ACHURA's duty to a business invitee. The substance of the business invitee charge is not in issue. ACHURA, however, argues that the jury could have decided from the evidence that plaintiff was either a social guest or trespasser. Because ACHURA contends that a landowner owes a lesser duty of care to a social guest and trespasser than to a business invitee, it reasons that the erroneous charge led to an unjust result.

In light of our decision to reverse and remand, the trial court will decide the appropriate charge based on a new record. Nevertheless, we offer some observations to guide the court and parties at a new trial. We begin by noting that, based on the record before us, the court properly limited its instruction to the duty of care that defendants owed business invitees of the Schoolhouse Apartments.

We agree with both the trial court and the Appellate Division that there was no evidence in the record that plaintiff was a trespasser. That plaintiff and his friend were "buzzed" in to the apartment complex by the security guard makes it difficult for ACHURA to argue that plaintiff did not have a right or privilege to be there. Admittedly, there were discrepancies in plaintiff's and Robinson's accounts of who they were there to visit. That,

however, does not detract from the fact that ACHURA's security guard opened the gate and permitted plaintiff to enter.

Moreover, it is undisputed that the fight between Abdullah and Robinson and the shooting of plaintiff occurred in common areas of the Schoolhouse Apartments. As the landlord, ACHURA had the responsibility to render those areas reasonably safe for the use of both tenants and their guests. *Taneian v. Meghrigian*, 15 *N.J.* 267, 277–78, 104 *A.*2d 689 (1954). In the common areas of an apartment complex, tenants and their social guests are deemed to be business visitors of the landlord. *Id.* at 281, 104 *A.*2d 689. For business visitors, the landowner owes a duty " 'to conduct a reasonable inspection to discover latent dangerous conditions' as well as 'to guard against any dangerous conditions ... that the owner either knows about or should have discovered.' " *Parks v. Rogers*, 176 *N.J.* 491, 497–98 n. 3, 825 *A.*2d 1128 (2003) (quoting *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993)).

A landlord also has a duty to take reasonable security precautions to protect tenants and their guests from foreseeable criminal acts. *See Trentacost v. Brussel*, 82 *N.J.* 214, 231–32, 412 *A.*2d 436 (1980) (imposing liability on landlord for failure to "take reasonable security measures for tenant protection on the premises"); *see also Clohesy v. Food Circus Supermarkets, Inc.*, 149 *N.J.* 496, 500, 516–17, 694 *A.*2d 1017 (1997) (holding landowner liable for supermarket customer's murder after her abduction from parking lot because criminal acts were foreseeable even though prior crimes on property were "lesser in degree"); *Butler v. Acme Mkts., Inc.*, 89 *N.J.* 270, 274, 280, 445 *A.*2d 1141 (1982) (holding that supermarket could be liable to customer who was mugged in supermarket's parking lot because of its knowledge of other muggings on premises during preceding year); *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 371–72, 382–83, 346 *A.*2d 76 (1975) (holding landlord could be liable for burglary of tenant's apartment because landlord had breached duty of care by failing to provide functioning deadbolt lock). When a landlord knows or

should know of a pattern of criminal activity on his premises that poses a foreseeable risk of harm to his tenants and their guests and does not take reasonable steps to meet the danger, he cannot escape liability merely because the criminal act was committed by a third party who was not within his control. *See Trentacost, supra,* 82 *N.J.* at 222, 412 *A.*2d 436; *see also Taneian, supra,* 15 *N.J.* at 281, 104 *A.*2d 689 (describing landlord's duty of reasonable care to protect tenants and their social guests against dangers in common areas); *cf. Scully v. Fitzgerald,* 179 *N.J.* 114, 122, 843 *A.*2d 1110 (2004) (holding that landlord owes duty "to take reasonable steps to curtail the dangerous activities" on premises "of which he should be aware and that pose a hazard to the life and property of other tenants"); *Williams v. Gorman,* 214 *N.J.Super.* 517, 523, 520 *A.*2d 761 (App.Div.1986) (asserting that landlord has duty to protect tenant from other tenant's foreseeable criminal acts), *certif. denied,* 107 *N.J.* 111, 526 *A.*2d 182 (1987).

 We realize that based on new evidence at the retrial, ACHURA may attempt to make out a case that plaintiff was a trespasser and request a different jury charge. We do not suggest that, given the conditions at the Schoolhouse Apartments and the peculiar circumstances of this case, the duty of ACHURA would be different even if plaintiff were a trespasser. It is true that a landowner owes a lesser duty of care to a trespasser " 'under most circumstances' " and is required "to warn 'only of artificial conditions on the property that pose a risk of death or serious bodily harm.' " *Parks, supra,* 176 *N.J.* at 497 n. 3, 825 *A.*2d 1128 (quoting *Hopkins, supra,* 132 *N.J.* at 434, 625 *A.*2d 1110). However, "[l]andowners owe a higher duty even to trespassers when their presence is foreseeable." *Brett v. Great Am. Recreation, Inc.,* 144 *N.J.* 479, 508–09, 677 *A.*2d 705 (1996) (noting that "the common-law classifications of persons on land should be applied flexibly in assessing the landowner's general tort obligation to avoid foreseeable harm to others"); *cf. Restatement (Second) of Torts* § 336 (1965) ("A possessor of land who knows or has reason to know of the presence of [a trespasser] is subject to

liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety.").

We recognize that "[i]n many instances, a landowner's liability for injuries is no longer based exclusively on the status of the injured party." *Clohesy, supra,* 149 *N.J.* at 502, 694 *A.*2d 1017. "The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996); *see also Clohesy, supra,* 149 *N.J.* at 502, 694 *A.*2d 1017 (same). In light of those considerations, the trial court should exercise its sound judgment on a fully developed record and determine the applicable standard of care and the appropriate charge to be given to the jury.

## IV.

In view of our decision to reverse, ACHURA's claim that the trial court erred in awarding plaintiff counsel fees and costs pursuant to the Offer of Judgment Rule, *Rule* 4:58-1, -2, is rendered moot. We nevertheless address the issue raised to provide guidance to the parties on remand.

To place the issue in its procedural context, a little background is necessary. Before trial, ACHURA filed a petition in bankruptcy that resulted in an automatic stay of all claims against it. With the consent of plaintiff and ACHURA, the United States Bankruptcy Court vacated the stay in this case, but limited the recovery of any judgment by plaintiff to ACHURA's "insurance coverage in effect" at the time of the shooting.

Both ACHURA and Community Realty were insured under a policy that provided a $1,000,000 occurrence limit. In addition, the policy provided coverage for such things as "costs taxed against the insured in the 'suit' " and prejudgment interest for any award paid by the carrier. Under the policy terms, supplementa-

ry payments would "not reduce the limits of insurance." As noted, Community Realty settled with plaintiff for $100,000. That amount was paid by the insurance carrier, reducing ACHURA's occurrence coverage to $900,000.

Plaintiff made an $800,000 settlement offer to ACHURA in the form of an offer of judgment. *R.* 4:58-1, -2. ACHURA rejected that offer. Thereafter, the jury awarded plaintiff $2,364,331.45 in damages, finding ACHURA 40% liable and Community Realty 30% liable and Community Realty to be ACHURA's agent. Based on the jury's agency determination, the court then allocated to ACHURA 70% liability for the damages—$1,655,032.02—and measured that amount against plaintiff's $800,000 settlement offer. Because plaintiff's jury award was greater than 120% of the settlement offer, the court decided that plaintiff was entitled to counsel fees and costs pursuant to *Rule* 4:58-2.

■■■ ACHURA contends that in light of the bankruptcy court's decree limiting any recovery against ACHURA to its insurance coverage, the rejected offer should have been measured against the $900,000 remaining on the policy. By that standard, ACHURA reasons that plaintiff did not recover more than 120% of its settlement offer.

The plain language of the Offer of Judgment Rule, however, does not lend support to ACHURA's argument. That rule, at the time relevant to this litigation, provided:

> If the offer of a claimant is not accepted and the claimant obtains a *verdict* or *determination* at least as favorable as the rejected offer, the claimant shall be allowed, in addition to costs of suit, ... (c) a reasonable attorney's fee, which shall belong to the client, for such subsequent services as are compelled by the non-acceptance. In an action for unliquidated damages, however, no allowances under this rule shall be granted to the offeror unless the amount of the recovery is in access of 120% of the offer.
>
> [*Rule* 4:58-2 (2002) (emphasis added).]

The fee-shifting provisions of *Rule* 4:58-2 are triggered by a "verdict" or "determination." Here, the *verdict* in favor of plaintiff far exceeded 120% of plaintiff's offer. The language, structure, and policy rationale of the rule do not support the notion that plaintiff's offer should be measured against the insurance coverage

rather than the verdict. "The offer-of-judgment rule is designed particularly as a mechanism to encourage, promote, and stimulate early out-of-court settlement of negligence and unliquidated damages claims that in justice and reason ought to be settled without trial." *Schettino v. Roizman Dev., Inc.*, 158 *N.J.* 476, 482, 730 *A.*2d 797 (1999) (internal quotations omitted). The rule "was intended to penalize "a party who rejects a settlement offer that turns out to be more favorable than the ultimate judgment." *Ibid.*

ACHURA must have suspected that a jury verdict might significantly exceed the settlement offer. If it were risk-averse, ACHURA had a powerful incentive to accept the offer. Instead, it chose to leave its fate to the jury in the precarious hope that it might achieve a judgment better than plaintiff's offer. ACHURA gambled and lost.

We agree with the Appellate Division that the trial court properly awarded attorneys' fees and costs by comparing the settlement offer to the jury verdict rather than the available monies under the insurance policy. *Gonzalez, supra,* 368 *N.J.Super.* at 213–14, 845 *A.*2d 700. Nonetheless, the remand for a new trial requires that we vacate that award.

## V.

We reverse and remand to the trial court for proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justice LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.