33 A.3d 1230

JOHN CAMBRIA, PLAINTIFF, v. TWO JFK BLVD., LLC, DAVID RUBIN, AND HORIZON PROPERTY MANAGEMENT, LLC, DEFENDANTS. AND TWO JFK BLVD., LLC, AND DAVID RUBIN, DEFENDANTS/THIRD–PARTY PLAINTIFFS–RESPONDENTS, v. JFK FOOD & DELI, INC., THIRD–PARTY DEFENDANT, AND HARLEYSVILLE INSURANCE COMPANY, THIRD–PARTY DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 15, 2011[1]—Decided January 5, 2012.

[1] The matter was argued before two members of the panel on September 27, 2011. With the joinder of a third judge to the panel, the matter was reargued telephonically.

500

Before Judges CARCHMAN, FISHER and BAXTER.

*Lance J. Kalik* argued the cause for appellant Harleysville Insurance Company of New Jersey (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Kalik,* of counsel; *Mr. Kalik* and *Tracey K. Wishert,* on the brief).

*Robert M. Brigantic* argued the cause for respondents Two JFK Blvd., LLC, and David Rubin (*Maloof, Lebowitz, Connahan & Oleske,* attorneys; *Mr. Brigantic,* on the brief).

The opinion of the court was delivered by

FISHER, J.A.D.

Plaintiff John Cambria was injured when he slipped and fell in the icy parking lot of a strip mall owned by Two JFK Blvd., LLC (the landlord). Among the many claims asserted, the landlord and defendant David Rubin, a real estate manager, sought a declaration that they were covered by a liability insurance policy obtained by one of the strip mall's tenants, third-party defendant JFK Food & News, Inc. (the tenant), that was issued by third-party defendant Harleysville Insurance Company of New Jersey.

Cross-motions for summary judgment regarding the tenant and Harleysville's obligations sought disposition of two discrete issues. The motion judge was first asked to consider whether the tenant complied with a lease term that required the naming of the landlord as an additional insured on the Harleysville policy. And second, if the tenant failed to obtain this coverage for the landlord, the judge was required to determine whether the landlord or Rubin or both were nevertheless covered by way of the "real estate manager" provision in the Harleysville policy. The judge found the tenant failed to obtain the required coverage for the landlord but determined he did not have to consider whether the tenant was liable for breaching the lease in this respect because, in his view, Rubin was the tenant's "real estate manager." Because we reject the judge's interpretation of the scope of the term "real estate manager," we reverse and remand for further proceedings.

The judge correctly recognized that those entitled to coverage under the Harleysville policy were only the named "insureds," which, as relevant here, included the tenant and "[a]ny person (other than your employee), or any organization while acting as *your* real estate manager" (emphasis added). Because the policy unambiguously defined the word "your" as referring only to the tenant, the validity of the summary judgment entered in favor of the landlord and Rubin turns on whether either of them could be said to be *the tenant's* real estate manager.

 The factual record amply demonstrated that Rubin was *a* real estate manager and certainly *the landlord's* real estate manager. The judge found the landlord was obligated to maintain the common areas and delegated that authority to Rubin, who was hired to maintain the strip mall's records, collect the rents, and care for and maintain the property. But, to succeed on their claim that Harleysville owed them a defense and indemnification, the landlord and Rubin had to demonstrate more; they had to provide evidence not just that Rubin was a real estate manager or that he was the landlord's real estate manager but that he was the tenant's real estate manager. We conclude that the record, when viewed in the light most favorable to the landlord and Rubin,[2] fails to meet that requirement.

Although not defined by the policy, the phrase "real estate manager" has not surprisingly been understood as encompassing, as its name suggests, entities or persons who manage real estate for another. *See, e.g., Sumitomo Marine & Fire Ins. Co. of Am. v. So. Guaranty Ins. Co. of Ga.,* 337 *F.Supp.*2d 1339, 1357–59

---

[2] It is true that insofar as Harleysville sought a reversal of the summary judgment entered against it, Harleysville was entitled to have the evidential material examined in the light most favorable to it. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 A.2d 146 (1995). However, because disposition of this appeal leads to our conclusion that Harleysville is entitled to summary judgment, we have examined the evidential materials in the light most favorable to the landlord and Rubin, the opponents of that motion.

(N.D.Ga.2004); *Dempsey v. Clark*, 847 *So*.2d 133, 137 (La.App. 2003). But this is not where the dispute lies in this case. Rubin certainly acted as a "real estate manager." The question is whether—with regard to the portion of the premises where the slip and fall occurred—Rubin was acting as the landlord's or the tenant's real estate manager. And that question turns on an understanding of whether the incident occurred in the leased premises or some other area of the property for which the tenant was responsible.

As explained by the lease, the "leased premises" did not include any part of the parking lot where plaintiff fell.[3] Notwithstanding, the landlord and Rubin argue that the tenant's obligation to patrons or passersby extended to the sidewalk abutting the tenant's premises regardless of the fact that the sidewalks were not encompassed within the defined leased premises. *See, e.g., Stewart v. 104 Wallace Street, Inc.*, 87 *N.J.* 146, 149, 432 *A.2d* 881 (1981). And, in that regard, they seek our adherence to an unreported decision in which we viewed a tenant's obligation to obtain insurance coverage for a landlord as encompassing claims of patrons injured on ice on the sidewalk adjoining the tenant's premises.[4] We need not reach that interesting argument because plaintiff did not slip and fall on the sidewalk, and common law principles that impose sidewalk liability on business owners have not been extended to nearby parking lots.

[3] The "leased premises" were defined as including "a portion of the building," which was described by reference to its square footage and its designation on a map not included in the appendix, as well as the tenant's "proportionate share of the common area." That proportionate share, however, was not described as including the parking lot, only areas "of the building used for public corridors, public toilets, air-conditioning rooms, fan rooms[,] janitor's closets, electrical closets, telephone, stairways, elevator shafts and vertical ducts and shafts with their enclosing walls," and including "the right, in common with other tenants in the building, to use the common entranceways, foyers, lavatories, stairways and elevator."

[4] Because that opinion was not published, it possesses no precedential value. R. 1:36–3.

The landlord and Rubin also argue that we have previously interpreted the "real estate manager" provision as expansive enough to include Rubin here, citing *First Nat'l Bank of Palmerton v. Motor Club of Am. Ins. Co.*, 310 *N.J.Super.* 1, 708 *A.2d* 69 (App.Div.1997). We held in that case—in considering a similar provision—that a mortgagee in possession of foreclosed property constituted the mortgagor's real estate manager. *Id.* at 5–7, 708 *A.2d* 69. That circumstance, however, is distinguishable from the matter at hand. In *Palmerton,* possession of the property fell upon the mortgagee as a result of foreclosure. Although we recognized the mortgagee, in taking possession and managing the property, acted on its own behalf, the mortgagee also acted in the mortgagor's interests. As a result, under the policy there in question, the mortgagee was acting as the mortgagor's real estate manager. *Id.* at 9, 708 *A.2d* 69. Here, the landlord retained the sole responsibility for maintaining and caring for the parking lot and, as a result, Rubin acted as the landlord's real estate manager with regard to snow and ice removal from that area.

█ Consequently, the contention that either the landlord or Rubin constituted the tenant's real estate manager [5] must fail unless there is merit to their last contention—that the lease otherwise saddled the tenant with a duty to care for the parking lot. Specifically, the landlord and Rubin rely on the provision that imposes on the tenant the obligation to pay "additional rent" consisting of the tenant's "proportionate share" of the "operating costs," which were defined as including, among other things, the "costs and expenses related to the [b]uilding and [b]uilding [a]reas of operating, repairing, cleaning, insuring (including, but not limited to, public liability, workmen's compensation, property damage

---

[5] Interestingly, having found *Rubin* to be the tenant's real estate manager, the judge concluded that *the landlord* was entitled to coverage under the "real estate manager" provision. Even if the judge's analysis of *Rubin's* expansive role was correct, it did not necessarily follow that *the landlord* was entitled to coverage. The judge did not explain how his finding regarding Rubin's role could extend to require Harleysville to provide coverage to the landlord, another reason for reversing the summary judgment entered in favor of the landlord.

and hazard and property insurance), and removing snow and debris." We reject this argument. This provision does not purport to alter the fact that common law principles impose on the landlord the duty to maintain the parking lot and other common areas in a reasonably safe condition for the use of both tenants and their guests. *See, e.g., Gonzalez v. Safe & Sound Sec. Corp.,* 185 *N.J.* 100, 121, 881 *A.*2d 719 (2005). That this provision may have advised the tenant of the manner in which part of the rent would be applied does not shift the burden of caring for the common areas to the tenant.

With regard to the fundamental understanding of the parties' liability for incidents occurring on the leased premises and the common areas, the lease provided that the tenant agreed "to indemnify and save [l]andlord harmless from and against all liability, and all loss, cost and expense ..., arising out of the operation maintenance, management and control *of the [l]eased [p]remises* or in connection with ... any injury or damage whatsoever *caused by the [t]enant ...* or *by [l]enant's property,* arising out of any occurrence *on the [l]eased [p]remises*" (emphasis added). The lease concomitantly declared that "[t]enant shall not be obligated to hold harmless or indemnify the [l]andlord from or against any liability ... arising solely from any act, omission or negligence of [l]andlord." These provisions delineate the parties' respective responsibilities regarding the entire property, limiting the tenant's obligation to indemnify the landlord to the tenant's own acts arising from its use of the leased premises and not beyond, as we have recognized. *See Pennsville Shopping Ctr. Corp. v. Am. Motorists Ins. Co.,* 315 *N.J.Super.* 519, 522–23, 719 *A.*2d 182 (App.Div.1998), *certif. denied,* 157 *N.J.* 647, 725 *A.*2d 1128 (1999).[6] We, thus, reject the contention that the additional-rent provision imposes some greater obligation on the tenant; that provision simply declares that the landlord would devote a portion of the rent toward the landlord's operating costs and the mainte-

[6] Even if some ambiguity could be found in these or any other provisions, the lease fails to expressly impose on the tenant the responsibility for maintaining

nance of the common areas. That a portion of the rent was devoted by the landlord to hire someone to care for the common areas, which were the landlord's responsibility, does not alter the parties' rights and obligations regarding the common areas or render that hired person the real estate manager for the tenant. In short, the fact that the lease explains the manner in which the owner disburses a portion of the rent does not, a fortiori, render the tenant liable for areas outside the leased premises or convert the landlord's real estate manager into the tenant's real estate manager. The obligation to care for the common areas remained with the owner absent a clear and unambiguous declaration to the contrary that cannot be found in the parties' lease.[7]

For these reasons, we conclude that neither the landlord nor Rubin acted as the tenant's real estate manager. Accordingly, the order granting the landlord's and Rubin's motion for summary

and making the parking lot and other common areas safe for persons utilizing those areas. Indeed, the lease is replete with provisions that suggest common law principles of liability, which impose the duty on the landlord to maintain common areas in a reasonably safe condition for use by tenants and guests, *Gonzalez, supra,* 185 *N.J.* at 121, 881 *A.*2d 719, remained unaltered. That is, as we have determined, the lease defines the leased premises as the enclosed portion of the building in which the tenant operated his business, and no more. And the additional-rent provision relied upon by the landlord and Rubin recognizes that the operating costs were those incurred *by the landlord* in fulfilling its obligation to care for the common areas, e.g.: *"[l]andlord's 'operating costs'* shall refer to the expenses incurred in or reasonably attributable to operating and maintaining the Building and Building Area in a manner deemed *by [l]andlord* reasonable and appropriate and for the best interest of the [t]enants in the [b]uilding, including without limitation ... removing snow and debris" (emphasis added). Any ambiguity in this provision that might be alleged as suggestive of a shifting of the burden of caring for the parking lot to the tenant was dispelled by Rubin, when he testified at his deposition that the tenant had no "responsibility for removing snow or ice in the parking lot" and no "responsibility for monitoring the condition of the parking lot for snow or ice."

[7] We need only briefly mention the case law not urged by the landlord and Rubin in support of their position until reargument of this appeal. In those cases, like here, the incident in question "occurred off the tenant's premises, but close to those premises." *Liberty Village Assoc. v. West Am. Ins. Co.,* 308 *N.J.Super.* 393, 396, 706 *A.*2d 206 (App.Div.), *certif. denied,* 154 *N.J.* 609, 713

judgment and denying Harleysville's motion for summary judgment, and the order denying Harleysville's motion for reconsideration, are reversed. The matter is remanded for entry of summary judgment in favor of Harleysville and for any other proceedings necessitated by our disposition of this appeal.[8] We do not retain jurisdiction.

A.2d 500 (1998); *see also Harrah's Atlantic City, Inc. v. Harleysville Ins. Co.*, 288 *N.J.Super.* 152, 157, 671 *A.2d* 1122 (App.Div.1996); *Franklin Mut. Ins. Co. v. Security Indem. Ins. Co.*, 275 *N.J.Super.* 335, 337–38, 646 *A.2d* 443 (App.Div.), *certif. denied,* 139 *N.J.* 185, 652 *A.2d* 173 (1994). We find these cases inapposite because they considered the extent of insurance coverage where the landlord was named as an additional insured on the tenant's policy and therefore triggered the policy provisions that covered the landlord for events arising out of the use of the tenant's premises. As we have observed, the landlord here was not named as an additional insured, and his and Rubin's claims for coverage under Harleysville's policy depend solely on the application of the "real estate manager" provision.

[8] For example, the judge did not reach whether the tenant breached the lease by failing to have the landlord named as an insured on the Harleysville policy because he found the landlord was, in fact, covered by the policy terms notwithstanding that omission. Now that we have determined that the landlord and Rubin were not covered, the parties may have an interest in continuing the litigation on that unresolved point.