**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3870-13T4

JOSH WILLNER, An Infant by his
Guardian ad Litem, LESTER WILLNER,
LESTER WILLNER, Individually,
and AMY WILLNER, Individually,

      Plaintiffs-Respondents,

v.

VERTICAL REALITY, An Entity Doing
Business in the State of New Jersey,
and VERTICAL REALITY MANUFACTURING,
INC., An Entity Doing Business
in the State of New Jersey,

      Defendants-Respondents,

and

IVY LEAGUE CAMP, An Entity Doing
Business in the State of New
Jersey,

      Defendants,

and

NUMATICS, INC.,[1]

      Defendant-Appellant.

_____

---

[1] ASCO Numatics improperly pled as Numatics, Inc.

Argued November 15, 2016 — Decided  June 5, 2017

Before Judges Espinosa, Suter, and Guadagno.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-163-08.

Joseph DiRienzo argued the cause for appellant (DiRienzo, DiRienzo & Dulinski, P.A., attorneys; Mr. DiRienzo, on the briefs).

Craig A. Borgen argued the cause for respondents Vertical Reality, Inc. and Vertical Reality Manufacturing, Inc. (Miller & Borgen, attorneys; Mr. Borgen, on the brief).

Cynthia A. Walters argued the cause for respondents Josh Willner, Lester Willner, and Amy Willner (Budd Larner, P.C., attorneys; Ms. Walters and Terrence J. Hull, on the brief).

PER CURIAM

On July 19, 2006, plaintiff Josh Willner began climbing a mobile "rock wall" at the Ivy League Day Camp (Ivy League). Willner, who was sixteen at the time, was employed by Ivy League as a junior counselor.  Willner was wearing a helmet and a harness attached to an auto-belaying cable,[2] and was guided by a

---

[2] Testimony at trial described the auto-belay system as one that replaced the traditional system in which "another person holds a belay rope so in case the person [climbing] falls . . . the belay rope prevents them from falling all the way down."

camp employee "specialist" trained to operate the rock wall apparatus.

After reaching a height of twelve to fifteen feet, Willner pushed off the wall in order to descend. Willner heard a loud noise and the cable connected to his harness lost tension. He dropped to the ground, fracturing his ankle. Willner required surgery to repair his ankle. Subsequent investigation of the auto-belay system indicated that the cast aluminum retainers in the hydraulic cylinders failed, causing a loss of fluid from the cylinder, resulting in the cable holding Willner to lose all tension.

In 2009, Willner and his parents, Lester and Amy Willner, filed a complaint alleging strict products liability, negligence, and per quod claims against Ivy League, Vertical Reality, Inc. (Vertical Reality), the rock wall manufacturer, and ASCO Numatics, Inc., (Numatics), the manufacturer of the cylinders used in the rock wall's auto-belay system. In 2010, Willner filed a second amended complaint naming defendant Vertical Reality Manufacturers, Inc.[3]

---

[3] Vertical Reality Manufacturing, Inc. began doing business in June 2005. Vertical Reality ceased doing business in September 2008. The trial judge found Vertical Reality Manufacturing, Inc. to be Vertical Reality's corporate successor. We refer to the entities collectively as "Vertical Reality."

Willner filed an offer of judgment on or about May 25, 2012, in the amount of $125,000. Neither Vertical Reality nor Numatics accepted the offer of judgment.

The case was tried to a jury before Judge Joseph P. Quinn over eleven days in December 2013. The jury returned a verdict in Willner's favor finding (1) Vertical Reality's rock wall was designed defectively; (2) Vertical Reality's design defect was the proximate cause of Willner's accident; (3) Numatics' product had a manufacturing defect; (4) Numatics' product proximately caused Willner's accident; (5) Vertical Reality's rock wall contained inadequate warnings; and (6) Vertical Reality's inadequate warning proximately caused Willner's accident.

The jury awarded Willner $17,000 in medical expenses, $1000 per quod medical expenses, and $340,000 for pain and suffering. The jury allocated liability at seventy-percent to Vertical Reality and thirty-percent to Numatics. On March 24, 2014, the trial judge entered an order granting Willner's application for counsel fees and costs under the offer of judgment rule, as well as pre-judgment interest.

Numatics appeals from the denial of its motions for directed verdict at the close of plaintiff's case and at the close of evidence; from the denial of its motion for judgment

notwithstanding the verdict (JNOV); from the jury verdict; and from the molded judgment.

Numatics argues the trial court erroneously denied its motions for directed verdict and motion for JNOV on the manufacturing defect claim because neither Willner nor Vertical Reality proffered any evidence of Numatics' deviation from its design or performance specifications, or that the pores in the casting proximately caused Willner's accident. Numatics also contends the court erred in failing to issue a limiting instruction to the jury regarding evidence of Numatics' conduct, failed to instruct the jury on the permissible scope of the evidence concerning its use of cast retainers instead of machined retainers, and that these and other errors cumulatively denied Numatics of a fair trial. Finally, Numatics asserts the trial court erred in awarding Willner attorney's fees and costs under the offer of judgment rule, because Numatics' individual liability did not exceed the offer of judgment.

At trial, consulting engineer Thomas J. Cocchiola testified for Willner as an expert in engineering design and safety, and submitted a report containing his observations and conclusions. Cocchiola described the automatic belay system as including two pulleys located at the back of the climbing wall connected to the top of two cylinders. A cable ran from the front of the

climbing wall around a pulley located at the top of the wall and another pulley above two cylinders containing hydraulic fluid. The oil and air in the cylinders served "as a damping device to basically lower and lift the climber."  Cocchiola further explained

> as a person climbs up the rock wall the pressure in the system, the air pressure, will . . . retract the belay ropes to keep the slack out of the belay ropes. So as the person climbs up, . . . the rope retracts or it . . . stays taut . . . . But then if a person actually slips, falls, needs the belay system, then as the weight of the person goes onto that cable . . . that force of the weight of the person and the other forces, the dynamic forces, go through the cable, through that pulley system . . . and ultimately to the bracket that's mounted to the top of the cylinders.

Cocchiola found the auto-belay system was not adequately designed to support the load of Willner's weight of 250 pounds. Cocchiola examined the cylinders which failed, resulting in Willner's fall.  Each cylinder was equipped with a cast aluminum bushing retainer on the rod end.  When the retainers failed, the cylinders "blew apart" causing hydraulic fluid to leak through the open ends of the cylinders.  This failure caused Willner to "plummet" and break his ankle.

Jose Balter, a Numatics salesman, testified that he approached Vertical Reality in 2004 to sell them cylinders.

Balter had previously worked for Marco Fluid Power, selling cylinders manufactured by Parker Hannifin, the original cylinders used by Vertical Reality in its rock walls.

Kenneth Sharkey, the owner of Vertical Reality, testified that his company used the Parker Hannifin cylinders for four or five years without ever experiencing a failure. After Balter switched companies, he approached Sharkey and offered "a better product with more efficient pricing." Sharkey agreed to switch from the Parker Hannifin cylinders to Numatics because "they were very aggressive in their pricing [and] told us they would make a better cylinder for us and more efficient and more cost-effective." Vertical Reality gave Numatics a sample Parker Hannifin cylinder to be used as a design prototype.

Mark Pigg, a Numatics product engineer, designed the cylinder used in this case. Pigg testified that the Numatics cylinder matched the Parker Hannifin cylinder's "form, fit and function," but there were certain design differences: the Numatics cylinder contained a retainer with a "floating bushing design," while Parker Hannifin used a "threaded-in bushing" without a retainer. Pigg sent a drawing of the proposed cylinder, but it did not specify whether the retainer was cast or machined.

Pigg testified the prototype cylinder and all subsequent cylinders employed cast retainers, but Sharkey testified that the first prototype employed a machined retainer, but later shipments were all cast retainers. Sharkey, who is not an engineer, did not know the difference between cast and machined retainers and testified that no one at Numatics advised him of the change.

Numatics obtained the cast retainers from Sherman Pressure Castings (SPC). Documents introduced at trial indicate that in 2004 and 2005, Numatics returned several retainers received from SPC for cracks. Pigg testified that by 2009, Numatics switched from cast to machined retainers.

Cocchiola testified that he examined the area where the cast Numatics retainers cracked and noted a "void" or "an empty space within the casting" in both failed retainers. Cocchiola opined that the retainers were defectively manufactured and contributed to the "design deficiency" of the belay system.

In rendering his opinion, Cocchiola relied, in part, on documents indicating that Numatics was aware of cracks in the retainers shortly after it began shipping cylinders to Vertical Reality. In May 2005, fourteen months before Willner's accident, Numatics inspected 2300 cast retainers and discovered cracks in 101 of them.

A-3870-13T4

Dale Alexander was called by Numatics and accepted as an expert in the fields of engineering, metallurgy, and failure analysis. Alexander testified that porosity is inherent in castings and whether a casting is defective "depends on whether it's capable of achieving its design intent." Alexander performed three tests: a finite element analysis, a moment of inertia analysis, and a fracture mechanics analysis. Alexander opined that these three tests indicated that despite the pore, the retainers were "manufactured in a manner that was reasonably fit, suitable, and safe for [their] ordinary and reasonably foreseeable purposes on 250 PSI rated cylinder."

In denying Numatics' motion for a new trial or JNOV, Judge Quinn noted that it was undisputed that the cracked cylinders resulted in Willner's fall, and while Cocchiola and Alexander "disagreed on the calculation as to the static load that was imported onto the cylinders as a result of [Willner's] descent from the rock-climbing wall . . . [t]hat was something that the jury had to resolve." Judge Quinn continued:

> There clearly was a failure of the retainers in this cylinder. They broke. They broke at their weakest part. That's what caused the cylinders to fail.
>
> No one disputes, moreover, that the machined retainers did not break either from the previous manufacturer or from Numatics. The cast retainers broke. They broke in this

plaintiff's case, and they broke in other cases and were ultimately replaced.

The evidence I thought was clear to the jury that the cast retainers, and I don't think anyone — any expert disputed this — contained voids. And the cast retainers containing the voids, which are the retainers that broke, were weaker than the machined retainers, and that they broke at their weakest point.

And I think all of the experts essentially agreed that cast retainers contain voids and are weaker. That's where they broke. And that breaking is essentially what caused the failure of this cylinder, and the plaintiff's shattered ankle when he fell.

. . . .

I think in this case there is ample evidence from which a jury could conclude that there was a product defect in this retainer, in the cylinders, i.e., the cylinder retainers were weaker, containing voids, and those were the ones that were cast as opposed to the machined retainers, which didn't break and contained no voids.

In reviewing a trial court's decision on a motion for judgment, or directed verdict, pursuant to Rule 4:40-1, and motion for JNOV, Rule 4:40-2(b), we apply the same standard of review as the trial court. Frugis v. Bracigliano, 177 N.J. 250, 269 (2003). A motion for directed verdict must be denied "[i]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately

be deduced therefrom, reasonable minds could differ." Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000) (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997)).

"Conversely, a 'dismissal is appropriate when no rational jury could conclude from the evidence that an essential element of the plaintiff's case is present.'" Perez v. Professionally Green, LLC, 215 N.J. 388, 404 (2013) (quoting Pron v. Carlton Pools, Inc., 373 N.J. Super. 103, 111 (App. Div. 2004)); Fruqis, supra, 177 N.J. at 270 ("[I]f the evidence and uncontradicted testimony is 'so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.'" (quoting Ferdinand v. Agric. Ins. Co., 22 N.J. 482, 494 (1956))). However, courts are "not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).

N.J.S.A. 2A:58C-2 provides in relevant part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . deviated from the design specifications, formulae, or

performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae.

"A product is deemed to be defective if it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold." Myrlak v. Port Auth. of N.Y. & N.J., 157 N.J. 84, 97 (1999) (citation omitted).  A manufacturing defect arises "when the product comes off the production line in a substandard condition based on the manufacturer's own standards or identical units that were made in accordance with the manufacturing specifications." Id. at 98. "Imperfect material, a defective weld, or some physical damage in the product exemplify the usual claim." Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 170 (1979).  However, "[t]he occurrence of an accident and the fact that someone was injured are not sufficient to demonstrate a defect." Lauder v. Teaneck Volunteer Ambulance Corps., 368 N.J. Super. 320, 332 (App. Div. 2004) (citing Scanlon v. Gen. Motors Corp., 65 N.J. 582, 590 (1974)).

Numatics was asked by Vertical Reality to design a cylinder that would "match the [Parker] cylinder exactly."  The cylinder produced by Vertical Reality differed from the Parker Hannifin design in two significant ways:  the Parker Hannifin used a

12

screw-in head which was admittedly stronger than the retainer used by Vertical Reality, and the Parker Hannifin was made from machined material as opposed to the weaker cast aluminum collar used by Vertical Reality. The jury had ample evidence in the record to determine that, in employing the cast retainer, the Numatics cylinder was manufactured defectively, and was a proximate cause of Willner's accident.

Next, Numatics argues that there was an improper focus on its conduct during trial which led the jury to act "irrationally," and the judge erred in failing to instruct the jury that it was not to consider evidence of its conduct when determining the manufacturing defect claim. Specifically, Numatics claims (1) both parties referred to Numatics' negligence in their opening statements; (2) testimony was elicited regarding Numatics' pre-accident knowledge of cylinder failures; (3) testimony was elicited that Numatics should have performed calculations to evaluate the safety of Vertical Reality's climbing wall and the components within it; (4) testimony was elicited that Numatics should have taken action to repair or replace retainers in Vertical Reality climbing walls already out in the field; and (5) there was testimony that Numatics was negligent in manufacturing cylinders with cast instead of machined retainers.

A-3870-13T4

This evidence was relevant to plaintiffs' design defect and failure to warn claims which were not dismissed against Numatics until the close of evidence. While a limiting instruction at that point would have been appropriate, it was not requested. Similarly, Numatics did not object to the absence of a jury instruction as to the treatment of conduct evidence in the jury charge, which it now claims requires a new trial. We review both claims for plain error. R. 2:10-2.

During summation, counsel for Vertical Reality argued:

> The only failures were with the cylinders that [N]umatics sold to Vertical Reality with cast retainers. And we know, the evidence is clear that the cast retainers are weaker. We know that they have less load carrying capabilities.
>
> Numatics chose to use those retainers, because it's cheaper. Numatics chose to use those retainers, not any input from Vertical Reality.

Numatics[4] objected and moved for a mistrial,[5] which was denied by the court. The court sustained Numatics' objection

---

[4] The transcript reflects Willner's counsel, Mr. VanDyke, objected to Vertical Reality's statements during summation and moved for a mistrial, however this appears to be a transcription error. In Numatics' brief, Numatics states its counsel, Mr. DiRienzo, made these objections.

[5] Although Numatics moved for a mistrial following both Willner's and Vertical Reality's comments during summation — which were denied by the trial court — Numatics does not appeal the trial court's denial of these motions.

and request for a curative instruction, instructing the jury "to disregard the last comment.  That's not an issue that you're going to be charged on, or have to decide in connection with the case."

Numatics submitted the following request to charge the jury as to the conduct of the parties:

> In a products liability case such as this one, negligence is not an issue for your consideration.  You are not to focus on the conduct of the parties.  Rather, the issue for your determination is on the condition of the products that have been alleged to be defective. . . .  Likewise, if you find that a product is not defective, then you must find that in favor of that defendant as to plaintiff's claim, regardless of that defendant's conduct.

Judge Quinn gave the jury a charge substantially mirroring the Model Jury Charge. See Model Jury Charge (Civil), 5.40B, "Manufacturing Defect" (2009):

> Plaintiff has made a manufacturing defect allegation against the Defendant, Numatics, alleging that the cast retainer that was on the cylinder at the time of the accident contained a void and was weaker and therefore rendered it defective.  Numatics denies this claim.
>
> Let me give you some applicable concepts when dealing with the claim of a manufacturing defect, and then I'll explain what the Plaintiff must prove to establish a defect in manufacturing.

So, a manufacturing defect may be established by proof that as a result of a defect or flaw, which happened during the production, or while in Defendant's control, the product was unsafe and that unsafe aspect of the product was a substantial factor in causing the Plaintiff's accident.

To establish this claim for a manufacturing defect, the Plaintiff must prove the following elements by a preponderance of the credible evidence: that the cylinder contained a manufacturing defect, which made the product not reasonably safe. To determine if the cylinder had a manufacturing defect, you must decide what the condition of the cylinder as planned should have been according to Numatics' design specifications or performance standards and what its condition was as it was made.

If you find there's no difference between these two conditions, then there's no manufacturing defect. If there was a difference you must decide if that difference made the cylinder not reasonably safe for its intended or reasonably foreseeable uses. If the answer is yes, then you found the cylinder to be defective. Plaintiff need not prove that Numatics knew of the defect, nor that Numatics caused the defect to occur.

In instructing the jury as to the design defect claim against Vertical Reality, the court reiterated to the jury that Numatics was not liable on design defect grounds:

Since Vertical Reality was using a 250 PSI-rated cylinder at the time that it was [sic] switched cylinders made by Numatics, there had been no proof that Numatics substantially participated in the integration of a component into the rock climbing wall. Since all of the experts agree there was no design defect in

16

the cylinders themselves, there's no evidence that Numatics substantially participated in the design of the auto belay system. So, you must not consider Numatics liable on a design defect. The claim of design defect refers to claims against Vertical Reality.

In addition, Judge Quinn instructed the jury that there was no evidence Numatics had participated in the design of the rock wall or the belay system:

> The manufacturer of a component part that bundles a component of a system in accordance with the specifications of the donor has no legal duty to ensure that its component part[] was safely integrated into the larger system. . . . there had been no proof that Numatics substantially participated in the integration of a component into the rock climbing wall. . . . [and] there's no evidence that Numatics substantially participated in the design of the auto belay system.

After the jury began deliberation, it requested a written copy of the judge's instructions. The judge told the jury he would read back any specific request but the written instructions are not provided to juries in civil cases. The jury then asked for a read-back of the judge's manufacturing defect instructions, which was done.

On the following day, the jury sent out a note inquiring: "If we answer no for Question Number 3 [("Was defendant [Numatics'] cylinder manufactured defectively?")], can we still assign a percentage of fault to both party — both companies?"

17

In response, the judge instructed the jury: "The answer to your question would be no" and it would "need to follow the instructions on the jury verdict sheet, and follow the jury verdict sheet. . . . So if you find that there's no manufacturing defect, then the allocation under Question 7, which is percentage of fault, would be zero."

Numatics now argues these questions evidence the jury's "confusion created by the judge rejecting Numatics' requested charge in the face of conduct evidence." We disagree.

Trial courts have "an absolute duty to instruct the jury on the law governing the facts of the case." State v. Koskovich, 168 N.J. 448, 507 (2001) (quoting State v. Concepcion, 111 N.J. 373, 379 (1988)). "It is firmly established that '[w]hen a jury requests a clarification,' the trial court 'is obligated to clear the confusion.'" State v. Savage, 172 N.J. 374, 394 (2002) (alteration in original) (quoting State v. Conway, 193 N.J. Super. 133, 157 (App. Div.), certif. denied, 97 N.J. 650 (1984)). When a trial court instructs the jury in accordance with relevant legal principles, the reviewing court should "presume that the jury understood and followed those instructions." Ibid.

When presented with the jury's question, Judge Quinn provided the jury with a succinct and accurate instruction

18                                                    A-3870-13T4

explaining that if it did not find that Numatics manufactured the cylinder defectively it could not still assign a percentage of fault to it. There were no objections to the instruction from counsel and the jury sought no additional guidance or clarification before rendering its verdict. "That the jury asked for guidance during deliberations merely indicates that the jury took its job seriously and conscientiously worked to come to a just decision." People v. Minniweather, 703 N.E. 2d 912, 916 (1998). Upon our review of the record, we conclude that Judge Quinn's pre- and post-deliberation instructions were proper and appropriate and did not constitute error, let alone plain error.

Finally, Numatics argues the trial court erred in granting Willner's motion for sanctions pursuant to the offer of judgment rule because the molded judgment against Numatics did not exceed 120% of Willner's offer of judgment.

Rule 4:58-2(a) provides in pertinent part:

> [I]f the offer of a claimant is not accepted and the claimant obtains a money judgment, in an amount that is 120% of the offer or more, excluding allowable prejudgment interest and counsel fees, the claimant shall be allowed, in addition to costs of suit: (1) all reasonable litigation expenses incurred following non-acceptance; (2) prejudgment interest of eight percent on the amount of any money recovery from the date of the offer or the date of completion of discovery, whichever

19

> is later . . . ; and (3) a reasonable
> attorney's fee for such subsequent services
> as are compelled by the non-acceptance.

As Judge Quinn noted, plaintiff's offer to settle the case for $125,000 was not accepted by either defendant. As the jury's award to plaintiff for pain and suffering and medical expenses totaled $358,000, Judge Quinn found the rule "clearly" applied.

Numatics now contends the judgment against it should be vacated because its pro rata share of the total verdict amounted only to $107,400, which is below the $144,000 threshold to trigger sanctions. This argument was not raised before Judge Quinn and is not properly before us. It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). However, in the interest of completeness, we choose to address the claim and find it lacks merit.

"The offer-of-judgment rule is 'designed . . . as a mechanism to encourage, promote, and stimulate early out-of-court settlement of . . . claims that in justice and reason

20

ought to be settled without trial.'" <u>Schettino v. Roizman Dev.</u>, 158 <u>N.J.</u> 476, 482 (1999) (quoting <u>Crudup v. Marrero</u>, 57 <u>N.J.</u> 353, 361 (1971)).  To incentivize settlement, and thereby "fulfill its purpose, the rule imposes financial consequences on a party who rejects a settlement offer that turns out to be more favorable than the ultimate judgment." <u>Ibid.</u>  "Given those purposes, it would thwart the rule to allow a party who has rejected a settlement to escape mandatory payment for any portion of the costs incurred as a result of his decision." <u>Wiese v. Dedhia</u>, 188 <u>N.J.</u> 587, 593 (2006).

"The rule did not specifically address whether a jury's verdict or a molded judgment would trigger the rule's benefit. . . . however . . . for purposes of determining which party prevails under the Offer of Judgment Rule, <u>the amount of the actual verdict is compared to the amount of the offer</u>." Pressler & Verniero, <u>Current N.J. Court Rules</u>, comment 3 on <u>R.</u> 4:58 (2017) (emphasis supplied).

<u>Gonzalez v. Safe & Sound Sec. Corp.</u>, 185 <u>N.J.</u> 100 (2005), involved a multi-defendant verdict after a ruling by the United States Bankruptcy Court had limited the liability of one of the defendants to the insurance coverage in effect at the time of the underlying incident. <u>Id.</u> at 113, 123.  The Court held that in determining whether the offer of judgment rule applied, the

amount of the offer was to be compared with the amount of the jury verdict rather than the amount of defendant's potential liability. Id. at 124 ("The fee-shifting provisions of Rule 4:58-2 are triggered by a 'verdict' or 'determination.' Here, the verdict in favor of plaintiff far exceeded 120% of plaintiff's offer.").

Plaintiff relies on the Court's recent decision in Wadeer v. New Jersey Manufacturers Insurance Company, 220 N.J. 591 (2015), in arguing that the molded verdict controls. This reliance is misplaced. Wadeer involved an uninsured motorist (UM) claim made by plaintiff against his carrier, New Jersey Manufacturers Insurance Company (NJM). Id. at 595. Before trial, NJM rejected plaintiff's offer of judgment in the amount of $95,000. Id. at 596. The jury awarded plaintiff $222,175 for pain and suffering and lost wages but the trial judge reduced the judgment to $100,000, the limit of NJM's policy. Ibid. The judge also awarded attorney fees and costs pursuant to Rule 4:58-2. Ibid.

The Wadeer Court noted that the offer of judgment rule, "as currently written, does not explicitly provide whether the jury's verdict is the trigger for the sanctions and remedies of Rule 4:58-2 or, conversely, whether the molded judgment controls." Id. at 611. The Court then held

22

> the molding of a monetary jury award is appropriate when done to conform with and reflect allocation of liability. However, in the UM/UIM context, where reduction is based not on a tortfeasor's comparative negligence but instead on the policy limits of a given carrier, we find that the current construction of <u>Rule</u> 4:58-2 provides no incentive for such carriers to settle.
>
> [<u>Ibid.</u>]

The Court concluded that "the aims of <u>Rule</u> 4:58-2, 'to encourage, promote, and stimulate early out-of-court settlement,' are ill-achieved in the UM/UIM context under the rule's current construction" and referred <u>Rule</u> 4:58-2 to the Civil Practice Committee for comments and recommendations. <u>Ibid.</u> (quoting <u>Crudup</u>, <u>supra</u>, 57 <u>N.J.</u> at 357).

The <u>Wadeer</u> Court did not mention <u>Gonzalez</u>, let alone overrule it, and "the underlying logic of <u>Wadeer</u> and <u>Gonzalez</u> are congruent." Pressler & Verniero, <u>supra</u>, comment 3 on <u>R.</u> 4:58.

<u>Wadeer</u> does not compel the use of molded judgments in determining whether the offer of judgment rule is applicable as Numatics suggests. We find no reason to disturb Judge Quinn's decision to award fees and costs based on the offer of judgment rule.

Defendant's remaining arguments, including his claim of cumulative error, lack sufficient merit to warrant further discussion in our opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24

A-3870-13T4