NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1523-19

DEBORAH MARINO, Executrix
for the Estate of ANITA
CREUTZBERGER and Individual
Heirs of the Estate of ANITA
CREUTZBERGER,

      Plaintiff-Respondent,

v.

ABEX CORPORATION, BORG
WARNER CORPORATION, DANA
COMPANIES, LLC, HONEYWELL
INTERNATIONAL, INC., KELSEY-
HAYES COMPANY, MAREMONT
CORPORATION, and MOTION
CONTROL INDUSTRIES, INC.,

      Defendants,

and

FORD MOTOR COMPANY,

      Defendant-Appellant,

_____

> **APPROVED FOR PUBLICATION**
>
> **Mach 24, 2022**
>
> **APPELLATE DIVISION**

Argued February 2, 2022 – Decided March 24, 2022

Before Judges Whipple, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law
Division, Middlesex County, Docket No. L-0836-10.

Sean Marotta (Hogan Lovells US LLP) argued the cause for appellant (K&L Gates, LLP and Sean Marotta, attorneys; Joseph F. Lagrotteria, Adam G. Husik, Gary M. Sapir and Sean Marotta, on the briefs).

William L. Kuzmin argued the cause for respondent (Cohen, Placitella & Roth, PC, attorneys; William L. Kuzmin, Jared M. Placitella and Christopher M. Placitella, of counsel and on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Defendant Ford Motor Company (Ford) appeals from a final judgment awarding plaintiff Deborah Marino, Executrix for the Estate of Anita Creutzberger, $800,000 in damages for the death of her mother Anita Creutzberger (decedent) due to peritoneal mesothelioma. Ford contends that the trial court erred in ruling that it violated a consent order and in selecting and implementing sanctions against it. We affirm.

Decedent was diagnosed with peritoneal mesothelioma in early 2008 and died on April 5, 2008, at age eighty-five. Although decedent's husband, Peter Cruetzberger, Sr. (Peter),[1] predeceased her in 1989 after suffering from

---

[1] Because they share the same surname, we refer to decedent's husband by his first name and to decedent's son with the husband's name by his suffix, Junior. In doing so we mean no disrespect.

pneumonia, she was survived by their son Peter Cruetzberger, Jr. (Junior), and plaintiff, their daughter.

For almost thirty years, Peter worked at several Ford and Lincoln Mercury car dealerships, mostly as a service manager starting in the late 1950's. Peter supervised the parts department and all on-site car repairs performed by dealership mechanics. Ford trained Peter and gave him a card that certified that he passed all required tests in accordance with Ford's Certified Training Program (CTP) and that, while he was employed directly by the dealerships, he was nonetheless entitled to all privileges and benefits available to professional Ford Motor Company service technicians. Peter did not wear a uniform, but wore slacks, a white shirt, sweater, and tie while at work.

Junior visited Peter when he was working in Passaic and Newark Lincoln Mercury dealerships in the late 1950's and early 1960's. At both locations, Peter's workspace in the service area was not separated by partitions from the bays where the mechanics were working.

While Peter was serving as service manager at Heinz/Royal Lincoln Mercury, Junior spent three summers working there. He swept out the service bays, emptied trash cans and helped with brake jobs, under Peter's supervision. Peter's desk was in the service area next to the bays, and he was constantly moving around the service area consulting with the mechanics.

A-1523-19

When the mechanics performed brake jobs once or twice each week, they used air compressor hoses to blow dust off the old brakes for inspection purposes, causing large dust clouds. Powdery dust came out of the new brake boxes when they were opened, and fans in the service area blew the dust all around. Dust from discarded brake boxes rose when Junior emptied trash cans, and dust swirled around him while he was sweeping. According to Junior, dust got all over both him and Peter.

While Peter was working as service manager at Maplecrest Lincoln Mercury, Junior volunteered at the dealership several Saturdays each month. He became covered in dust when he swept out the service bays following brake jobs near Peter's desk.

Junior also visited Peter at Claridge Lincoln Mercury in Montclair and Dawson Ford in Summit. There was a dusty haze in the service areas at both dealerships due to brake blow-offs and fans, and dust settled on Peter. At Claridge, Peter had an exposed desk near the bays, while at Dawson he had a service counter surrounded by three glass walls but no roof. As was his habit, Peter spent most of his time away from his desk when he worked at these dealerships. No one wore respirators at Dawson.

Plaintiff visited Peter when he was the service manager at Maplecrest Lincoln Mercury, Claridge Lincoln Mercury, and Dawson Ford. She confirmed

A-1523-19

4

that there were no partitions by the desks Peter used at Maplecrest and Claridge, and that Peter was generally walking around the service areas and standing next to the mechanics.

At the end of each workday, Peter and Junior put their work clothes into an unlined hamper that was used by the entire family. Junior recalled that he sometimes saw a little dust when he threw his own clothes into the hamper. Although Junior did not notice if Peter's clothes looked different at the end of the day, plaintiff recalled often seeing a fine misty dust on Peter's clothes and in his black hair. Two or three times per week, decedent washed the family's intermingled laundry. Plaintiff observed dust come off the clothes when decedent took them out of the hamper. According to plaintiff, doctors told her that decedent's mesothelioma was caused by "her being around asbestos."

On February 3, 2010, plaintiff filed suit against Ford and seven other defendants seeking wrongful death, survival act, and punitive damages for the decedent's death.[2] She alleged that decedent was exposed to asbestos contained in Ford brakes and that this exposure caused her to develop peritoneal mesothelioma. She alleged that Ford: (1) breached its warranty that its asbestos-containing products were safe; (2) was negligently or strictly liable for its failure to warn of the health risks created by its products; and (3) negligently

---

[2] The other defendants were dismissed from the case prior to trial.

violated its assumed duty to protect dealership workers and their families by failing to provide them with the same warnings and guidance for handling its asbestos products that it provided to its own employees. The case proceeded through discovery.

In the June 25, 2014, deposition of Matthew Fyie, an employee designated by Ford to search for discovery responsive training materials, he testified he consulted with four Ford employees in preparation for his deposition and that none of these individuals had any information about, or could find any documents regarding, Ford's CTP from 1960 to 1990. Fyie stated that he had not reviewed any documents prior to the deposition because there were none to be found. Fyie denied any knowledge of CTP manuals and any recent testimony regarding the same.

However, following this testimony, plaintiff's counsel confronted Fyie with a 1974 Ford training manual entitled "Drum and Disk Brakes, Key Points to Diagnose and Repair Brake Systems." Fyie admitted that he had seen it before and that it was from the relevant time period. Although he initially stated that he did not recall previously testifying about this manual, he subsequently confirmed that he had been questioned about some parts of it in another case a few months earlier.

Plaintiff moved for sanctions and asked the court to suppress Ford's answer and enter a default judgment. On March 25, 2015, the trial court ruled that Ford violated Rule 4:14-2(c) concerning corporate depositions. It denied plaintiff's motion to strike Ford's answer and suppress its defenses, but sanctioned Ford instead by: (1) directing verdict to plaintiff on the issues of duty and breach of duty; and (2) ordering that the jury be advised that Ford violated a court order and withheld evidence and that as a result, the matters of duty and breach of duty had been resolved against them. The court also ordered Ford to pay plaintiff $14,419.30 in attorneys' fees and costs. The court denied Ford's motion for reconsideration. Two weeks before trial, the trial court explained that its earlier sanctions order against Ford necessarily included a directed verdict on general, but not specific, causation.

The matter was tried on various dates in June 2019. Jean Dawson, the former owner of Dawson Ford, testified that during the ten to twelve years Peter worked for her as service manager he spent most of his days walking around the service bays supervising. The dealership had a large service department with ten to twelve mechanics who performed many brake jobs. The mechanics used air hoses to perform brake jobs and to clean up the bays. She stated that, at the time, she knew nothing about asbestos and that Ford did not warn her that asbestos was hazardous.

Junior testified that Peter was never provided with a respirator, a locker, a showering area, or laundry service during his time at any of the Ford/Lincoln Mercury dealerships. Junior never saw warnings about asbestos hazards at any of the dealerships.

Plaintiff presented a fifteen-minute video produced in part by the United States Environmental Protection Agency (EPA) entitled "Don't Blow It," which Ford utilized. According to a Ford letter dated February 20, 1987, the video was designed for brake mechanics and addressed the potential health hazards from exposure to asbestos in brake dust, and how to effectively control the dust. Among other things, the video noted that: (1) millions of asbestos fibers could be released during brake servicing; (2) mesothelioma of the lungs or abdomen could result from inhaling asbestos fibers; (3) air hose use during brake servicing was now illegal; and (4) work clothes should be kept separate from clothes at home in order to protect family members from exposure to asbestos.

Plaintiff presented videotaped testimony from Ford representative Mark Taylor dated September 16, 2010. In this testimony, Taylor acknowledged that: (1) forty to sixty percent of Ford brakes consisted of chrysotile asbestos; (2) in 1973 Ford internally prohibited compressed air blow-offs; (3) it was not until technical service bulletin number ninety-nine in 1975 that Ford told its dealers to stop performing compressed air blow-offs; (4) Ford did not put warning labels

on their replacement brakes until 1980; and (5) Taylor was not aware of any other warnings disseminated by Ford to its dealerships between 1975 and 1980.

Plaintiff also read into the record deposition testimony from Taylor dated May 8, 2013. In that testimony, Taylor stated that: (1) he spoke to a Ford employee in preparation for his deposition; (2) in the 1950's Ford knew that brakes generated asbestos dust, and from 1970 on Ford was aware that asbestos was a carcinogen; (3) in 1973 Ford instructed its employees to use a vacuum to clean brakes after putting on protective clothing in a changing room; (4) Ford did not similarly warn dealerships until 1975; (5) Ford warned its own employees, but not its dealerships, about wearing asbestos-laden clothes home after work; and (6) Ford ceased using asbestos in its brakes in 2010.

Dr. Arthur Frank, who had a background in internal and occupational medicine, testified as plaintiff's expert regarding workplace asbestos exposures and the causation and development of asbestos-related diseases. Frank opined that, based upon his review of the record, decedent's cumulative household exposure to asbestos from washing Peter and Junior's dust-laden work clothes was sufficient to be a substantial cause of her peritoneal mesothelioma.

Frank explained that asbestos was a naturally occurring substance and that there were five types of amphibole asbestos fibers, comprising five percent of all asbestos in the world, and one type of chrysotile asbestos fiber, which

comprised the remaining ninety-five percent. Asbestos was recognized in the United States as the sole cause of mesothelioma, including the ten percent of mesotheliomas like decedent's that developed in the lining of the abdomen, i.e., the peritoneum.

Frank stated that everyone had some asbestos fibers in their bodies due to low level background exposure, but that this posed only an infinitesimal health risk. Rather, the "dose" needed to generate a harmful biological response, here mesothelioma, was an unknown amount above background levels. Given this uncertainty, Frank opined that the only safe dose of asbestos fibers was zero. He noted that the National Institute for Occupational Safety and Health (NIOSH), the Consumer Products Safety Commission, and the International Agency for Research on Cancer (IRAC) all agreed that there was no permissible exposure level (PEL) for asbestos and that any exposure increased the risk of cancer. He acknowledged that, unlike the above organizations, the American Conference of Governmental Industrial Hygienists promulgated recommended threshold limits.

Frank explained that, generally, the greater the exposure to, or dose of, asbestos fibers over time, the greater the likelihood of developing mesothelioma. Nonetheless, a small dose could cause mesothelioma in some people. Take-home cases, including small cumulative exposures such as in decedent's case,

were first recognized in the 1960's. It was also typical for asbestos-related cancers not to develop until ten or twenty years after exposure.

Frank confirmed that decedent had no evidence of asbestosis or pleural plaques. This did not alter his conclusions as asbestosis was associated with a higher level of exposure than that here and pleural plaques simply indicated exposure. Frank agreed that genetic mutations could make an individual more susceptible to mesothelioma, but he had no such information as to decedent. He also agreed that, with age, the body is less efficient at removing asbestos fibers.

When considering causation, Frank cautioned against exclusive reliance on tissue digests that isolated the different types of asbestos fibers because chrysotile asbestos fibers had a short half-life of ninety days, while it took two to three years for fifty percent of amphibole asbestos fibers to leave the body. According to Frank, historical dose was the key measurement, and because there was documented exposure to asbestos-containing brake dust in this case, Frank did not consider decedent's mesothelioma to be of undetermined cause.

Frank asserted that the most common source of asbestos in cars was in brakes. He identified four documents dating back to the mid-1970's, including a study, an agency report, and a Ford internal document, cautioning about exposure to asbestos dust in brakes, including in the context of take-home exposure. Frank disagreed with Ford's proposition that most mesotheliomas

A-1523-19

11

were not associated with the chrysotile asbestos found in brakes; rather, he maintained that most involved exposure to mixed fibers and some to just chrysotile fibers. He noted that IRAC recognized that both types of asbestos could cause mesothelioma. He disagreed with both the World Health Organization (WHO) and the Occupational Safety and Health Association (OSHA) that brake dust could not cause mesothelioma, noting that there was plenty of evidence regarding chrysotile-caused mesothelioma. He identified an epidemiological study of peritoneal mesothelioma in an eighty-eight-year-old woman whose husband had worked as a brake specialist.

Industrial hygienist Steven Paskal testified for plaintiff that asbestos fibers were recognized as a carcinogen in the early 1950's, and that in his profession there was no level of exposure below which there was no increased risk of cancer. While the risk of developing cancer from asbestos varied from person to person, generally the more one breathed in, the greater the likelihood of cancer.

According to Paskal, most asbestos releases were caused by human activities. He asserted that an auto mechanic was exposed to asbestos through dust from brakes and that Junior's observations of the clouds of dust in the service areas confirmed the workplace exposure to both him and Peter.

A-1523-19

12

Plaintiff's observations confirmed that Junior and Peter brought the dust home in their clothing.

Paskal explained that even a release of a small amount of dust could result in high levels of asbestos in homes because houses were sealed tight to save energy, limiting exchanges of air. When decedent sorted and shook out the family's laundry, she released asbestos dust that then lingered in the air. Even after the dust settled in the home, it would be repeatedly disturbed by activities such as vacuuming or sweeping. All of this dramatically increased the odds of decedent developing mesothelioma.

Paskal stated that it had been known since the 1940's that a worker should not bring contaminants home. The Journal of Industrial Hygiene from 1934 regarding health hazards in the foundry industry noted that if employees wore their work clothes home, the dust on their clothes would enter their houses and the residents therein would be exposed to any contaminants.

On cross-examination, Paskal conceded that during the braking process, the high temperature and pressure converted all but one to fifteen percent of the asbestos into non-asbestos substances, such as forsterite. On re-direct, Paskal identified a Ford document stating that this conversion occurred at 820 degrees Celsius. He noted, though, that even with severe usage, brake linings did not get hotter than 300 degrees Celsius.

A-1523-19

13

Defense's expert witness, pathologist Dr. Victor Roggli, opined regarding the etiology of decedent's mesothelioma. Roggli performed many studies in his career, including 1,400 tissue digestions to isolate and identify asbestos fibers in lung tissue, and published extensively regarding (1) the incidence of mesothelioma in brake mechanics and the amount and type of asbestos present in their lungs; (2) the amount of asbestos in the lungs of healthy individuals; and (3) the incidence of non-asbestos-related mesothelioma.

According to Roggli, decedent's exposure to the asbestos in Ford's brake products was not a contributing factor in her development of peritoneal mesothelioma. He agreed that decedent was exposed to asbestos from Peter and Junior's clothing, but opined it was an insufficient level of exposure to cause cancer. Rather, he opined that decedent's cancer occurred spontaneously or idiopathically.

Roggli explained studies that found up to eighty-five percent of women with peritoneal mesothelioma had no exposure to asbestos and that mesothelioma had not decreased over time in women as it had in men despite improvements in industry management of asbestos. Decedent had no asbestosis or pleural plaques, abnormalities commonly seen in asbestos workers resulting from an abnormal amount of asbestos in lung tissue. Further, older people like decedent were likely to have more mutations at the cellular level because genetic

errors occur more frequently with age as the body's defense mechanisms for protecting against asbestos become less efficient with age. Other causes of abdominal inflammation beyond asbestos could also cause mesothelioma.

Roggli disagreed with Frank that there was no safe level of asbestos exposure, noting that there was no evidence that background levels of asbestos caused mesothelioma. He explained that this was because the body's defense mechanisms were generally sufficient to counter this limited exposure. As such, Roggli believed that it would take an "appreciable dose" of asbestos for peritoneal mesothelioma to develop, and that it was unlikely that minimal take-home exposure, like decedent's, could cause disease. He noted that, according to one study, the lungs of launderers of asbestos-exposed work clothes had only one to four percent of the amount of asbestos found in the lungs of the workers themselves.

Roggli did not believe that brake dust in general caused or contributed to the development of peritoneal mesothelioma. He asserted that the chrysotile asbestos fibers in brakes could not actually get to the peritoneal cavity in a sufficient dose to cause mesothelioma because of the body's defense mechanisms, and noted that, according to the EPA, WHO and OSHA, peritoneal mesotheliomas were predominantly related to a type of asbestos not present in

A-1523-19

15

brakes. He noted that most of the asbestos in brakes was converted to forsterite and that brake dust contained less than one percent asbestos.

On cross-examination, Roggli conceded that peritoneal mesothelioma was more common in women than in men and the absence of pleural plaques or asbestosis did not mean that asbestos was not the cause of decedent's mesothelioma. He also conceded (1) that despite the EPA's position regarding the disease-potential of chrysotile fibers in brakes, the EPA acknowledged that because differences in mesothelioma hazard for various fibers had not been "conclusively proven," "it was prudent and in the public interest to consider all fiber types having comparable carcinogenic potency in quantitative assessment of mesothelioma risk;" and (2) that NIOSH had concluded that the "families of asbestos-exposed workers have been at increased risk of . . . peritoneal mesothelioma."

Roggli further conceded the connection between mesothelioma and prior asbestos exposure was undisputed; bystander and take-home cases of mesothelioma did occur; mesothelioma could result from brief, low-level or indirect exposure to asbestos, such as through laundering clothes; and when tissue was not available, a history of significant occupational, domestic or environmental exposure to asbestos would suffice for attributing someone's disease to that exposure as opposed to deeming it idiopathic. Some experts had

said that the failure to find asbestos bodies in tissue digestions could not be used to contradict a reliable occupational history of exposure, particularly to chrysotile fibers, since chrysotile asbestos rarely formed asbestos bodies and because of the lack of uniformity in laboratory procedures.

Roggli agreed that it was very helpful to take a personal history to determine whether someone's mesothelioma had been caused by asbestos or some other factor. He acknowledged that one of decedent's treating physicians at Somerset Medical Center (SMC) had written that "[t]he patient's husband worked with cars and may have been due to that. The patient works in jobs that were not associated with asbestos." Before writing his report, Roggli had reviewed this notation, which indicated that decedent's physician had asked about historical asbestos exposure. Roggli was not aware of any other contributory asbestos exposures in decedent's history.

Roggli confirmed that in various affidavits submitted in other asbestos cases he stated that "science has not demonstrated any proven cause of mesothelioma in the workplace other than exposure to all forms of asbestos dust" and upon diagnosis, "one of the first questions to resolve is where and when he or she was exposed to asbestos. Because asbestos dust is so strongly associated with mesothelioma, proof of significant exposure to asbestos dust is proof of specific causation in a given case," and the scientific and medical communities

have yet to determine a level of exposure to asbestos below which mesothelioma does not occur.

Toxicologist and pharmacologist Dr. Brent Finley, an expert in risk assessment focused on dose and exposure, testified that mesothelioma was a dose response disease. Dose was determined by the intensity, frequency and duration of exposure. Finley opined that the airborne level of asbestos during brake repair was below OSHA's workplace PEL and mechanics developed mesothelioma at the same rate as the rest of the population. Finley noted that, as Peter was not a career mechanic, but largely a bystander, his exposure would have been perhaps one-third that of the mechanics, and decedent's exposure would have been even less and likely within the range of background exposure or even zero. It was entirely likely that plaintiff had seen some other type of dust on Peter and his work clothes.

Finley opined that garage mechanics were not at increased risk because only chrysotile fibers were used to manufacture brakes, and these fibers were very short in length and present at very low concentrations. If decedent had been exposed through laundering, the dose would have been insufficient to increase her risk of developing mesothelioma. Many mesotheliomas were of unknown etiology and her disease, if asbestos-related, would have been due to other exposure. He stated that Ford responded appropriately.

A-1523-19

18

On June 20, 2019, the jury returned a verdict in plaintiff's favor and awarded her a total of $800,000 in compensatory damages. The jury denied plaintiff's claim for punitive damages.

On August 20, Ford unsuccessfully moved for judgment notwithstanding the verdict (JNOV) or for a new trial. On November 14, the trial court entered final judgment awarding plaintiff a total of $1,024,359.39, comprised of (1) $750,000 in Survival Act damages; (2) $50,000 in wrongful death damages; (3) $194,000 in prejudgment interest; and (4) $30,359.39 in counsel fees. Ford appealed.

I.

Violation of the Consent Order

Ford first argues that the trial court erred by ruling that it had violated the March 31, 2014, consent order. We reject Ford's argument.

A review of the record explains our conclusion. On February 13, 2013, plaintiff served a deposition notice for a knowledgeable Ford representative and requested the production of "[a]ll bulletins, manuals, directives, or other written information provided by Ford . . . to each dealership . . . concerning the handling, installation, and replacement of asbestos containing brakes and clutches" and the "protecti[on] of employees" performing this work "during the years 1960 to 1990."

One month later, on the date the deposition was to occur, Ford objected and refused to comply with the notice. That same day, plaintiff wrote to the court's special master requesting a formal recommendation that Ford's objections be overruled and the discovery produced.

Thereafter, on March 15, 2013, plaintiff served a second deposition notice for a Ford corporate designee knowledgeable about "[t]he information provided by [Ford] to Ford [d]ealers concerning the danger of asbestos containing products used in Ford cars and trucks from 1960 to 1990" and re-requested the same production of documents.

During the month before the scheduled deposition, counsel for plaintiff and Ford agreed to the scope of the notices and document requests. Ford agreed to produce the witness most knowledgeable about the information Ford provided to its dealers concerning the dangers of asbestos and the precautions necessary to prevent asbestos exposure. Ford further agreed to produce all "bulletins, manuals, directives or other written information provided by [Ford] to . . . [its] dealers," concerning (1) the "handling, installation and replacement of asbestos containing brakes and clutches during the years 1960-1990" and (2) the protection of employees doing that work during that time.

On May 8, 2013, Ford produced corporate designee Taylor for deposition. Taylor testified that Ford was "unable to locate" any training materials provided

to dealership mechanics during the relevant time period. He stated that, in preparing for his deposition, he spoke with one Ford service/dealership representative.

Following this deposition, plaintiff served a fourth deposition notice for the "representative from Ford most knowledgeable on the training program provided by [Ford] to brake mechanics and service and parts technicians from 1965 to 1995." The notice requested production of all "written material provided by Ford to brake mechanics and service and parts technicians from 1965 to 1995," "all information provided by Ford to brake mechanics and service and parts technicians from 1965 to 1995 relating to the dangers of asbestos," and "all information provided by Ford to brake mechanics and service and parts technicians from 1965 to 1995 concerning how to protect yourself from asbestos exposure."

In response, Ford filed an application with the special master for a protective order quashing the deposition and document requests. Ford represented that "there [were] no documents available responsive to [p]laintiffs' request." It further noted that, as to "information about the mechanic, service and parts training programs," Taylor had stated "if he did not know the answer, then no one did."

A-1523-19

21

On October 26, 2013, plaintiff filed a fifth deposition notice for a Ford corporate witness "with the most knowledge concerning the requirements of being designated a Ford Motor Company Service Technician during the years 1960 to 1990." Ford moved to quash this notice as well.

While these motions to quash were pending, Fyie was deposed about Ford's CTP on January 29, 2014, in a New York asbestos case captioned "Juni v. A.O. Smith Water Products Co." (Juni). Juni's counsel produced a June 1974 Ford training manual for dealer employees entitled "Drum and Disc Brakes, Key Points to Diagnose and Repair Brake Systems" (the 1974 training manual). Fyie confirmed that the manual was an authentic Ford document and stated that the manual was distributed as part of Ford's CTP for non-company service technicians working at Ford dealerships. He confirmed that the manual contained no warnings about asbestos exposure from friction products and made no recommendations as to precautions to avoid exposure, and he agreed that the manual recommended sanding brakes in certain instances. Notably, Fyie acknowledged that he had seen portions of the manual prior to January 2014. Plaintiff's counsel in this case learned of the 1974 training manual and, on February 18, 2014, amended plaintiff's interrogatory answers to incorporate Fyie's deposition testimony in Juni.

The special master overruled Ford's objections to both of plaintiff's outstanding discovery requests, and Ford sought relief in the trial court. Notwithstanding Fyie's deposition testimony in Juni, Ford continued to deny any ability to locate any training manuals, reiterated that there were no documents available concerning training tests or materials, and even insisted that there was no proof of a training program attended by Peter for which he received the "alleged" certification card. In response, plaintiff detailed Ford's repeated refusals to produce discoverable information and provided an image of Peter's card.

The parties resolved this dispute with a consent order filed by the trial court on March 31, 2014. The order required Ford to:

> 1. Search for training materials for the period 1960 to 1980 that were used to provide Ford sponsored training to dealership service managers and mechanics and any and all training for dealership service managers, and mechanics that referred to asbestos or handling asbestos containing products;
>
> . . . .
>
> 3. [P]roduce any responsive documents it locates and pursuant to [Rule] 4:14-(2)(c) a corporate witness having knowledge of facts relating to the Ford sponsored training to dealership mechanics and service managers from 1960 to 1980 within [seventy-five] days of the date of [the] order.

Three weeks later, on April 24 and 25, Fyie testified at the Juni trial about Ford's CTP. Fyie testified that, in preparation for his testimony, he primarily consulted with Albert Rocker, a Ford employee since 1978 who had been personally involved in Ford's CTP and had more knowledge about that program than anyone else. Fyie confirmed that the 1974 training manual was part of Ford's CTP for Ford dealership employees.

On May 27, 2014, Ford responded to this plaintiff's document request from the consent order.

> 1. Ford is unable to locate any training manuals for the period 1960 to 1980 that were used to provide Ford sponsored training to dealership service managers and mechanics. Ford is also unable to locate training material for the period 1960 to 1980 that was used by Ford during its sponsored training for dealership service managers and mechanics that referred to asbestos or handling asbestos containing products.
>
> . . . .
>
> 2. Ford has determined that there are no available lists of former employees of the subject dealerships who participated in Ford sponsored training for service mechanics for the period 1960 to 1980. Moreover, Ford has determined that there is no available data through which to identify former employees of the subject dealerships who were trained during the period in question.

One month later, on June 25, Ford produced Fyie for a videotaped deposition in the instant case "to talk about knowledge and facts relating to Ford

A-1523-19

24

sponsorship training programs for dealership mechanics and service managers from 1960-1980." During this deposition Fyie responded to nearly two hundred questions posed by plaintiff's counsel by saying "I don't know," "I'm not sure," "I'm not aware," or "I'm not familiar".

Fyie stated that he had not consulted Rocker prior to this deposition, but had instead spoken to: (1) Steve DeAngelis, a thirty-year Ford employee who worked as a manager in Ford's customer service division and was also involved in dealership technician training; (2) DeAngelis's subordinate Pat Dwan; (3) Dwan's subordinate Dave Gregoricka, an eight-year Ford employee who was in charge of training manuals for dealership training; and (4) another Dwan subordinate, Paul Garcia. According to Fyie, none of these individuals had any information about, or could find any documents regarding, Ford's CTP from 1960 to 1990. Fyie stated that he had not reviewed any documents prior the deposition because there were none to be found.

Fyie denied any knowledge of CTP manuals or that he had recently testified regarding them. He stated that he did not know whether Ford dealership mechanics were trained by Ford in the 1970's or what it meant to be a Ford-certified technician. He had no familiarity with a card such as Peter's. Fyie insisted that Ford had no records regarding Ford's CTP during the specified period.

Following this testimony, plaintiff's counsel confronted Fyie with the 1974 training manual. Fyie admitted that he had seen it before and that it was from the relevant time period. He stated that he had forgotten about this manual during earlier questioning. Although he initially stated that he did not recall testifying about this manual in Juni, he subsequently confirmed that he had been questioned about some parts of it. Fyie acknowledged that the manual recommended that the mechanics sand brakes in certain circumstances.

Fyie's testimony on June 25 led to plaintiff's motion to strike Ford's answer and suppress its defenses because Ford never produced the 1974 training manual in this case. Plaintiff argued that, while Ford had disseminated cautionary information regarding asbestos to Ford employees, it had not done so with respect to dealership employees, and decedent had suffered the consequences. The manual demonstrated that Peter had not, in fact, received the same promised benefits and privileges as actual Ford employees. Plaintiff argued Ford and Fyie had been on notice of the existence of this manual since January 2014 and yet Ford had not been forthcoming in discovery and allowed Fyie to give false testimony during his June 25 deposition.

Ford argued it had committed no discovery violation because it complied with plaintiff's discovery requests by providing more than 2,000 documents and had not hidden any information from plaintiff and had nothing to produce

A-1523-19

regarding warnings to dealership technicians. In <u>Juni</u>, the plaintiff's counsel, not Ford, produced the 1974 training manual. Ford also asserted the consent order did not apply to manuals, the 1974 training manual may have been purchased on eBay, and Ford could not be expected to comb the Internet for all relevant documents or monitor the documents produced by plaintiffs in all asbestos cases against it. Ford also asserted plaintiff's counsel should have produced the manual prior to Fyie's deposition and Fyie simply forgot about the manual. Ford argued Fyie made a good faith effort to obtain the information sought by the discovery questions and he did not speak with Rocker because he knew Rocker had no relevant knowledge. And finally, Ford argued the manual did not help or hurt Ford and at most, a monetary fine was warranted here.

Noting the disparities between Fyie's deposition and trial testimony in <u>Juni</u> and his deposition in this case, and on Fyie's authentication of the 1974 training manual, the court was persuaded that Ford had not complied with the spirit and intent of the March 2014 consent order. However, the trial court was unwilling to go so far as to strike Ford's answer and suppress its defenses as requested by plaintiff and instead expressed interest in finding a middle ground.

Plaintiff proposed that the court: (1) grant partial summary judgment to plaintiff as to whether Ford breached its duty to warn because it was as to those issues that Ford had violated the consent order; and (2) inform the jury at trial

A-1523-19

27

that, because Ford had violated a court order and withheld evidence, the court had found that Ford breached its duty to warn Peter. Plaintiff argued that Ford "[could] still put in all their other defenses, their medical defenses, their chrysotile defenses, whatever they want," and could also pursue their cross-claims. Defense counsel objected to this proposal, arguing that it was an unfair penalty given that the 1974 training manual did not help or hurt Ford.

At the conclusion of the March 25, 2015, hearing, the trial court ruled:

> The [c]ourt finds that Ford violated the spirit and intent of this negotiated consent order which required them to produce a knowledgeable individual[] as to the issues [raised]. . . . [T]his was actively negotiated. So the court looks at the – at the choices. The choice of the ultimate sanction, which is striking the answer and suppressing the defenses . . . .
>
> The awarding [of] fees is not curative, but the court finds that the middle ground suggested by the plaintiff leaves the defenses and leaves the opportunity for Ford to present a case, and so the [c]ourt will accept the offer and instruct the jury that . . . Ford violated a court order and withheld evidence, and that Ford breached a duty to the plaintiff in terms of the failure to warn.

The trial court entered an order to this effect and ordered Ford to pay plaintiff $14,419.30 in attorneys' fees and costs.

Ford moved for reconsideration. While the court's decision was pending, Ford filed an affidavit from Rocker wherein he reported he had worked at Ford since 1978, in Ford's Technical Training Department between 1988 and 1997,

had no knowledge regarding Ford's training programs between 1960 and 1980, and was not aware of any documents pertaining to same.

The trial court denied Ford's motion and further commented on Ford's conduct in this case.

> The conduct by Ford in this matter cannot be countenanced. Mr. Fyie was advanced by defendant Ford as its corporate designee. Ford had the responsibility of educating its [Rule] 4:14-2(c), [FED. R. CIV. P.] 30(b)(6) witness. The issues in this case, the training of Ford personnel was an issue in New York. Mr. Fyie testified about the training manual in New York. Two months later, he had no knowledge of the same document. He testified in New York that Mr. Rocker educated him on these issues. Two months later Mr. Rocker is not mentioned. And, in essence he educated himself by talking to individuals that had no knowledge of the issues that were the matter of a consent order.
>
> I have to say, I have reviewed the entirety of the transcript of [Mr. Fyie's deposition here] and it . . . certainly further supports the [c]ourt's original sanction. Countless times the testimony of Mr. Fyie is non-responsive, vague, and frankly, in this [c]ourt's opinion, designed to thwart that process. It is inconceivable to [the court] how he was educated in any manner.

Rule 4:14-2(c) states that, when a party seeks to depose an organization, that organization must designate a representative to testify on its behalf "as to matters known or reasonably available to the organization." As noted by Ford, given the dearth of relevant state case law regarding Rule 4:14-2(c), it is

A-1523-19

appropriate to look to federal case law addressing the largely identical corresponding federal rule, FED. R. CIV. P. 30(b)(6), for guidance. New Jersey Dep't of Env't. Prot. v. Exxon Mobile Corp., 453 N.J. Super. 272, 290 (App. Div. 2018).

In interpreting that rule, federal courts have emphasized that an organization must "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought . . . and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters." Harris v. New Jersey, 259 F.R.D. 89, 92 (D.N.J. 2007) (omissions in original) (quoting Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Res. Auth., 93 F.R.D. 62, 67 (D.P.R. 1981)). Information is reasonably available if it is in the corporation's "possession, custody or control." See Ethypharm S.A. France v. Abbott Lab'ys, 271 F.R.D. 82, 94-95 (D. Del. 2010).

Ford contends that the trial court erred in ruling that it had violated the March 31, 2014, consent order. According to Ford: (1) Fyie adequately searched for all reasonably available relevant materials by consulting with "the four Ford employees with the most-extensive knowledge of Ford's training programs;" (2) that these employees being unable to find any documents responsive to the order was understandable as Ford had no reason to retain such

A-1523-19

30

old documents; (3) Fyie was not required to consult with Rocker simply because Rocker was involved in the Juni case; (4) Fyie's unfortunate memory lapse as to the 1974 training manual was not sanctionable; and (5) Fyie's answers at his deposition were not unresponsive, but simply comported with the less than fruitful results of his adequate search.

The standard of review is whether the trial court abused its discretion in finding that Ford failed to comply with the consent order for discovery in this case. Gonzalez v. Safe & Sound Sec., 185 N.J. 100, 115 (2005); accord Abtrax Pharms. v. Elkins-Sinn, 139 N.J. 499, 513, 517-18 (1995).

The detailed record offers little support for Ford's claim that it acted in good faith in responding to plaintiff's key discovery requests in this case. Thus, we discern no abuse of the court's discretion in rejecting Ford's claim.

II.

Sanctions

Ford next argues that even if it violated the consent order, the trial court abused its discretion in imposing unreasonable sanctions that prevented it from fully defending itself in this case. We reject Ford's argument.

At the reconsideration hearing on July 31, 2015, Ford did not take issue with the court's finding that it had committed "a discovery violation" and that plaintiff was entitled to an award of counsel fees. Rather, Ford argued that the

additional sanctions removing the issues of duty and breach from the trial were unjust and unreasonable because Ford did not have the opportunity to argue against these sanctions. Ford asserts its failure to produce one document during discovery was not particularly egregious and plaintiff had not been prejudiced by Ford's conduct. Ford asserted the sanctions gave plaintiff a windfall.

In its September 23, 2015, decision denying reconsideration, the trial court noted first that the case had a "tortured procedural history," and that plaintiff had been forced to repeatedly apply to the court in order to obtain discovery from Ford. It then highlighted the disparities between Fyie's testimony in Juni and his testimony in this case. The court reiterated that Ford had violated "the spirit and intent of th[e] consent order" and that "monetary sanctions, while appropriate, were insufficient" to balance matters between the parties. The court denied Ford's motion for reconsideration.

Thereafter, on May 28, 2019, plaintiff's counsel argued to the court that if it was established that Ford breached its duty to warn Peter regarding the asbestos in brake dust, this by definition meant that Ford's brakes were defective for purposes of general causation. The trial court directed plaintiff to file a motion on this issue.

On May 31, 2019, plaintiff's counsel moved to preclude Ford's experts from offering testimony contesting general causation because, without a risk of

harm from Ford's brakes, Ford could not have breached a duty to warn. Specifically, plaintiff's counsel asserted that Ford's experts should not be permitted to opine that: (1) chrysotile asbestos could not cause mesothelioma; (2) by virtue of their shape and size, chrysotile asbestos fibers were readily removed from the body before cancer could result; (3) the chrysotile asbestos in Ford's brakes was fully converted to forsterite because of the heat generated while braking; and (4) scientific studies showed no increased risk of mesothelioma from Ford's brakes. Counsel noted that Ford could still contest specific causation by arguing that plaintiff was not exposed to asbestos, that her exposure was insufficient to cause cancer, that her mesothelioma was idiopathic, and that products from other manufacturers caused her disease.

Defense counsel responded that Ford should not be precluded from arguing that chrysotile asbestos does not cause mesothelioma. Counsel emphasized that, at the time the trial court sanctioned Ford, no one had understood the sanctions to include general causation. Defense counsel agreed that a product that was perfectly safe did not require a warning. Nonetheless, counsel maintained that, even if Ford's brakes were dangerous in some way that warranted a warning, this did not mean that they were dangerous in a way that could cause mesothelioma. In response, plaintiff's counsel noted that the only

duty alleged in plaintiff's complaint was to warn of dangers from the asbestos in Ford's brakes, including the danger of mesothelioma.

In its ruling, the trial court noted first that both parties relied on <u>Becker v. Baron Bros.</u>, 138 N.J. 145, 159 (1994), wherein the Supreme Court ruled that trial courts had to perform a risk utility analysis as to the specific product that was alleged to be defective. The court continued:

> And so let's look at what happened here. As a result of what the [c]ourt felt were discovery abuses and failure to comply with the [consent] order, the [c]ourt issued its ruling . . . with regard to the strict product failure to warn case and the negligence case . . .[.]
>
> [As to the former, a plaintiff must initially demonstrate] by a preponderance of the credible evidence that the product failed to contain an adequate warning instruction, the failure to adequately warn instruction existed before the product left the control of the defendant, that the plaintiff was a direct or reasonably foreseeable user, or a person who might reasonably be expected to come into contact with the product, and that the plaintiff would have followed an adequate warning instruction, if it had been provided. All of that is being taken away from the jury's decision . . . as a result of the [c]ourt's . . . order of March 25, 2015.
>
> In a negligence case, . . . in order for the defendant to be found liable, plaintiff must prove . . . by a preponderance of the credible evidence . . . that the defendant was negligent in failing to provide adequate warning instructions with its product, two, that the failure to warn or instruct existed at the time the product left the control of the defendant and did not undergo substantial change, three, that the plaintiff was a direct

or reasonably foreseeable user or a person who might reasonably be expected to come into contact with the product.

And so, again, that is being taken away from the jury. And so, if you look further, though, into what we ordinarily would charge is, so this is like the first element of the plaintiff's claim that . . . what in this case would be Ford's asbestos . . . product failed to contain an adequate warning or instruction. But then that, therefore, it is defective.

So that is resolved by way of the [c]ourt's determination, so that general causation has been decided. . . . This is about what happened in this case, what the [c]ourt has determined based upon Ford's conduct, that which the plaintiff will have to prove and the defendant will have to prove.

And so the plaintiffs are correct that, in essence, general causation is not part of this case. It cannot be because, therefore, it would allow Ford to reargue the issue of its duty, failure to warn, and that its product is defective.

In terms of . . . the issue of specific causation, that's left open and so that through [Ford's] experts, [Ford] can present evidence that it was not [mesothelioma] related to any asbestos exposure but, rather, it's idiopathic, that there was insignificant or no exposure, and that . . . the mesothelioma was due to the friction products or other products of other defendants . . . . And so general causation is out in terms of a defense and specific causation remains in this case.

According to Rule 4:23-2(b):

If a party or an officer, director, or managing or authorized agent of a party or a person designated under R. 4:14-2(c) or 4:15-1 to testify on behalf of a party

A-1523-19

35

fails to obey an order to provide or permit discovery, including an order made under R. 4:23-1, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(1) [a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(2) [a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the introduction of designated matters in evidence;

(3) [a]n order striking out pleading or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof with or without prejudice, or rending a judgment by default against the disobedient party;

(4) [i]n lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

"Sanctions are peculiarly necessary in matters of discovery and the power to invoke them is inherent in our courts." Abtrax, 139 N.J. at 513 (alteration in original) (quoting Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338

(1951)). When penalizing a party for misconduct, a court should impose an appropriate sanction, i.e., one that is fundamentally fair to both parties, Williams v. Am. Auto. Logistics, 226 N.J. 117, 124 (2016), and not the harshest one possible, Seacoast Builders Corp. v. Rutgers, 358 N.J. Super. 524, 549 (App. Div. 2003). Even where the violation was willful, only exceptional actions evincing "a deliberate and contumacious disregard of the court's authority" will warrant the most severe penalty. Gonzalez, 185 N.J. at 115 (quoting Kosmowski v. Atl. City Med. Ctr., 175 N.J. 568, 575 (2003)); Abtrax, 139 N.J. at 521.

The extent to which the non-complying party has impaired the other party's case "may guide the court in determining whether less severe sanctions will suffice." Gonzalez, 185 N.J. at 116. "The discovery rules are not to be used . . . to preclude a party from presenting its case when the evidence neither surprises, misleads [nor] prejudices the opposing party." Plaza 12 Assocs. v. Carteret Borough, 280 N.J. Super. 471, 477 (App. Div. 1995). When considering prejudice in the context of a discovery violation, a court should also take note of when in the litigation process the withheld evidence was uncovered. Rosenblit v. Zimmerman, 166 N.J. 391, 406-07 (2001).

On appeal, Ford argues first that the trial court's sanctions failed to consider that plaintiff was not prejudiced by its conduct. Ford insists that the

monetary penalty imposed here remedied the situation and was sufficient punishment. We reject this argument.

Although Ford downplays what occurred by stating that it simply failed to locate the largely irrelevant 1974 training manual and Fyie forgot it existed during his deposition, this is not accurate. First, Ford did not fail to locate the manual. Rather, Ford withheld it after: (1) Fyie was confronted with it twice in Juni; (2) Fyie admitted that he was aware of the manual even before his Juni deposition; and (3) plaintiff amended her interrogatories to incorporate Fyie's deposition testimony in Juni. Second, the claim that Fyie experienced sudden memory loss mere months after his testimony in Juni was highly implausible. And, while Ford admitted at trial that it did not send a warning to its dealerships until 1975, the 1974 manual constituted highly relevant physical proof that Ford not only did not timely warn its dealerships regarding asbestos as it did its own employees, but it actually recommended sanding brakes, a process that would release asbestos into the air.

Ford is correct that the sanctions were significant. However, we do not conclude that the trial court abused its discretion in deeming this discovery violation an exceptionally troubling and deliberate disregard of the court's authority. The record demonstrates the discovery violation was preceded by years of Ford resisting plaintiff's discovery requests and occurred despite the

A-1523-19

38

negotiated consent order. The court's sanction directly corresponded to the violation, which involved a document that supported plaintiff's claim that Ford failed to warn its dealerships of a known hazard. The court's eventual inclusion of a directed verdict on general causation was not excessive, but naturally flowed from the fact that a duty to warn only exists when the at-issue product is dangerous.

Moreover, we are not convinced Ford was particularly prejudiced by the sanctions. Ford presented experts to opine against specific causation of decedent's mesothelioma. And in fact, despite the court's ruling that its sanctions order included the issue of general causation, Ford was nonetheless able to elicit testimony from plaintiff's expert and both of its defense experts regarding every subject that was deemed precluded as general causation evidence: (1) that chrysotile asbestos could not cause mesothelioma; (2) that chrysotile asbestos fibers were readily removed from the body before cancer could result; (3) that the chrysotile asbestos in Ford's brakes was fully converted to forsterite; and (4) that scientific studies showed no increased risk of mesothelioma to mechanics from brake work. In so doing, Ford still presented its supposedly precluded position that there was no duty to warn here at all, and that Ford's erroneous instructions to dealership mechanics in its 1974 manual

and its untimely warning to its dealerships about asbestos was irrelevant. The jury nonetheless found for plaintiff.

III.

Implementation of Sanctions

Ford contends that the trial court committed reversible error in implementing its sanctions granting partial directed verdict to plaintiff as to duty and breach. In Ford's view, the trial court improperly found that its sanctions order would be undermined if Ford were permitted to present a general causation defense because Ford would then be reopening the issue of whether its brake products were dangerous. Ford also maintains that the court erred in allowing plaintiff to introduce deposition testimony from Fyie and Taylor and several internal Ford documents regarding Ford's knowledge of the dangers of brake asbestos during the relevant time period, because Ford's credibility was no longer at issue since duty and breach were established. We reject these arguments.

As we previously stated, Ford was able, through the testimony of Frank, Roggli, and Finley, to assert its position that chrysotile asbestos could not cause mesothelioma and that mechanics were not at any greater risk of developing mesothelioma than the general population. Thus, Ford could not have been prejudiced by the court's extension of its original sanctions order to cover

A-1523-19

general causation because Ford ultimately argued against general causation anyway. Moreover, given that Ford was able to question whether Ford had a duty at all here despite the court's sanctions, the court did not err in allowing plaintiff to present documents as to what Ford knew, and how and when it warned its employees. Ford's credibility regarding its claim that brake asbestos was not harmful was still open to challenge.

IV.

Out-of-Court Statements

Ford argues that the trial court committed reversible error in admitting two out-of-court statements as to the cause of decedent's mesothelioma.

During plaintiff's direct testimony the following colloquy occurred:

> [Plaintiff's counsel]: Okay. And after . . . the doctor gave you the diagnosis that [decedent] was diagnosed with mesothelioma, did . . . the doctor discuss with you any causes of mesothelioma?
>
> [Defense counsel]: Objection, Your Honor.
>
> THE COURT: Sustained. Don't answer. Rephrase.
>
> [Plaintiff's counsel]: During the course of . . . the conversations you had with the medical professionals, was that done in the context of them providing you with information either about [decedent's] diagnosis or her treatment?
>
> [Plaintiff]: Yes.

[Plaintiff's counsel]: Okay. And with regard to the conversations you had with those medical professionals regarding [decedent's] diagnosis or treatment, did they give you any further details about mesothelioma?

[Defense counsel]: Same objection, Your Honor.

THE COURT: Overruled. You can answer that question.

[Plaintiff]: They told me it was from asbestos, her being around asbestos.

[Defense counsel]: Your Honor, move to strike.

THE COURT: Overruled.

After plaintiff completed her direct testimony, defense counsel renewed his objection to plaintiff's testimony, arguing that it was hearsay and that it did not fall under N.J.R.E. 803(c)(4), the hearsay exception for statements relating to diagnosis and treatment. The court overruled counsel's objection, agreeing with plaintiff's counsel's argument that

> the discussions for purposes of diagnosis and treatment do work both ways. The objection was raised appropriately twice before. The question was rephrased. A proper foundation was made. Because generally, conversations back and forth, especially coming from a physician for purposes of diagnosis and treatment, as the foundation was laid, fall . . . within a hearsay exception.

During Roggli's cross-examination, he testified that it was very helpful to take a patient's personal history in determining whether their mesothelioma was

caused by asbestos or some other factor. When plaintiff's counsel subsequently attempted to introduce decedent's June 10, 2008, records from SMC, defense counsel objected and asked for a sidebar. Plaintiff's counsel stated that he wanted to discuss with Roggli the "impressions of a treating physician" wherein decedent's doctor wrote "[t]he patient's husband worked with cars and [her disease] may have been due to that. The patient works in jobs that were not associated with asbestos."

Defense counsel objected on hearsay grounds, arguing that this was the opinion of a non-testifying treating physician. Plaintiff's counsel insisted that the quoted passage was admissible under N.J.R.E. 803(c)(4) because it was contained in a medical record that was used for diagnostic purposes, and Roggli had testified that he reviewed this record in formulating his expert opinion. The trial court overruled defense counsel's objection given that Roggli had testified that personal history was helpful in determining the cause of mesothelioma and that he had reviewed the medical records from SMC for purposes of his opinion.

Thereafter, Roggli testified that the at-issue statements reflected that decedent's physician had properly inquired as to her personal history of exposure to asbestos, and that he had reviewed this record in issuing his expert opinion. Roggli agreed that those who worked in the automotive industry were at risk of

exposure to asbestos. He also acknowledged that he had not seen any other exposures in decedent's history that would have contributed to her cancer.

Decedent's statements to her treating physician, as related by Roggli, were properly admitted under N.J.R.E. 803(c)(4). Under that rule, a hearsay statement is admissible provided it "(A) is made in good faith for purposes of, and is reasonably pertinent to, medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." N.J.R.E. 803(c)(4). Here, decedent's statements as to her and Peter's work histories, made in response to her treating physician's inquiry as to her personal history of asbestos exposure, were made for purposes of determining the possible cause of her mesothelioma.

The trial court did not err in considering Roggli's acknowledgement that he had reviewed this record in reaching his opinion. The "totality of the facts on the basis of which [an expert] arrived" at his or her opinion must be made known to the factfinder so that it may evaluate the validity of the opinion and assign it appropriate weight. Bowen v. Bowen, 96 N.J. 36, 50 (1984) (quoting Glen Wall Assoc. v. Wall Twp., 6 N.J. Tax 24, 31-33 (1983)). Additionally, it cannot be ignored that decedent's treating physician merely noted that decedent's mesothelioma "may" have resulted from Peter's employment. This was hardly definitive proof of specific causation, and Roggli did not dispute that Peter's

A-1523-19

exposure to asbestos while at work was a relevant, if refutable, consideration here. Thus, we reject Ford's argument.

We do agree, however, that the court erred in admitting plaintiff's testimony that a treating doctor told her that decedent's mesothelioma was "from asbestos, her being around asbestos," as this was not a statement made by a patient for purposes of medical diagnosis or treatment in accordance with the requirements of N.J.R.E. 803(c)(4). However, we do not conclude that this single statement was so definitive on the issue of Ford's liability that it had the capacity to cause an unjust result here. The statement did not specifically reference Ford or Peter's employment, and was merely in accordance with the general understanding, acknowledged by Ford, that asbestos caused mesothelioma.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1523-19

45